[No. E005996. Fourth Dist., Div. Two. Apr. 6, 1989.]

ROBERT L. CORNISH, Petitioner, v.
THE SUPERIOR COURT OF RIVERSIDE COUNTY, Respondent;
CAPITAL BOND & INSURANCE COMPANY et al., Real Parties
in Interest.

COUNSEL

Jones, Mahoney & Brayton, Paul M. Mahoney and Richard A. Soll for Petitioner.

No appearance for Respondent.

Vallette & Bassin, Kent Leeds Vallette, Michael Robert Bassin, Donna E. Kirkner, John K. Van de Kamp, Attorney General, and Raymond B. Jue, Deputy Attorney General, for Real Parties in Interest.

## OPINION

HOLLENHORST, J.—Petitioner, plaintiff in the underlying action, filed a motion to disqualify the law firm of Vallette & Bassin (Vallette) from representing Capital Bond & Insurance Company (Capital), defendant in the action below, on the grounds that the law firm had previously represented petitioner in a number of lawsuits substantially related to the present action and had acquired confidential information from petitioner in the former representation. As will be explained, petitioner also sought to have the Attorney General disqualified. The motion was denied without prejudice by the trial court. Petitioner filed the within petition for writ of mandate. We issued an alternative writ but now deny a peremptory writ.

### FACTS

Petitioner was the prime contractor under a public works construction contract with the Elsinore Valley Municipal Water District in 1985. On May 28, 1985, petitioner entered into a written subcontract with Cities Development Group, Inc. (Cities) whereby the latter agreed to furnish labor and materials on the project.

Pursuant to the subcontract, Cities, as principal, and Capital, as surety, executed a payment bond and a performance bond in the penal amount of $319,580 for the Elsinore project. Cities also delivered to Capital an irrevocable letter of credit as collateral for the bonds.

As can be imagined, a dispute arose between petitioner and Cities, resulting in various stop notices and bond claims being filed by Cities' materialmen and suppliers as well as by Cities. Petitioner contends that, as a result of Cities' breach, petitioner has incurred damages in excess of $100,000.

Capital received a letter from petitioner dated December 17, 1985, in which petitioner advised Capital that in excess of $1 million in stop notices had been filed on the project and that Cities had been paid all funds earned under the subcontract. Petitioner put Capital on notice that petitioner was making a claim for the penal sum of the bonds because of the stop notices.

Sometime prior to March 1986, Capital retained Vallette to investigate the Elsinore project and to determine the validity of the claims being made against the bonds (including, we presume, the validity of petitioner's claim). In the course of the investigation, Vallette contacted the attorney for petitioner. Vallette requested petitioner's cooperation and requested access to petitioner's records for the project. Petitioner, through his attorney, agreed and Vallette inspected petitioner's records on February 28, 1986. Apparently, Vallette also spoke with petitioner's bookkeeper and office manager at that time.

Also, sometime prior to March of 1986, a number of lawsuits were filed to recover monies owed for work on the project.[1] Petitioner, again through his attorney, apparently tendered defense of some of the actions to Capital. In accepting the tender of defense on behalf of Capital, Vallette wrote to petitioner's attorney on March 6, 1986, advising him that defense was accepted with certain conditions and reservations including the proviso that "[i]f Capital elects to re-tender the defense . . . or if [petitioner] . . . and Capital become adversaries in future litigation, it is expressly agreed that Capital's counsel, whether [Vallette] or another firm, shall be entitled to continue representation of Capital and that no conflict of interest will be deemed to exist by reason of this firm's having provided a defense . . . ." By letter dated March 13, 1986, petitioner's attorney accepted the terms set forth in Vallette's letter with the understanding that the terms would be mutual, in other words, that his firm would be able to continue to represent petitioner in the event of future litigation with Capital.

Between March and December of 1986, petitioner's attorney sent Vallette numerous letters regarding the various lawsuits as well as Cities' performance under the subcontract in general and the project in general.[2] In

---

[1] Petitioner identifies 16 lawsuits but does not specify the dates these suits were filed or in which of these suits Vallette represented him. Capital states appearances were only entered on behalf of petitioner in five actions but does not identify when or in which actions the appearances were entered.

[2] Both parties have described the letters to some extent although Vallette's description is more detailed. Because petitioner has not objected to Vallette's description, we adopt the same.

It appears 10 of the letters were simply letters tendering defense of various lawsuits or advising Vallette the actions had been commenced. Seven of the letters pertain to other claims submitted by Cities' subcontractors and materialmen. Three of the letters pertain to petitioner's claim regarding the funds retained by petitioner and the amounts owed to Cities and apparently relate to Capital's request for contract funds retained by petitioner. One letter relates to certain affirmative defenses available to other defendants. Three letters pertain to principals of Cities, including work performed by the principals on other jobs, and petitioner's federal action against Cities and its principals. Additionally there was at least one letter and some conversations regarding Capital filing stop notice release bonds as well as letters transmitting notices of association of counsel and disassociation of counsel.

September of 1986, the Insurance Commissioner placed Capital in conservatorship and Vallette advised petitioner's attorney shortly thereafter that it was no longer able to continue to provide a defense to petitioner.[3]

On April 6, 1987, the Insurance Commissioner filed an action against Overland Bank on the irrevocable letter of credit provided by Cities to Capital. Petitioner filed a motion to intervene in that action but before the motion was heard, the Bank and the Commissioner settled, with the Commissioner receiving the full amount of the letter. After receiving relief from the stay in the conservatorship proceeding,[4] petitioner filed the present action to recover the proceeds in January 1988. Capital, represented by Vallette, and the Insurance Commissioner, represented by the Attorney General's office, filed a joint answer and joint cross-complaint. Thereafter, they filed a first amended cross-complaint alleging that petitioner had engaged in various acts of fraud and misrepresentation which entitled Capital to rescission and exoneration of its obligations under the bonds.[5]

Shortly after Capital's appearance in this action through Vallette, petitioner's attorney sent a letter demanding Vallette and the Attorney General remove themselves from the action because of the conflict of interest. Vallette and the Attorney General's office both refused and, in July of 1987, petitioner filed the motion to disqualify them.

In denying the motion, the trial court stated it was not convinced, based on the evidence submitted, petitioner had given confidential information to Vallette. The court denied the motion without prejudice and recommended a referee be appointed at petitioner's expenses to review the correspondence between petitioner's attorney and Vallette and to take other evidence to determine whether confidential information had been transmitted. The petition to this court followed.

## DISCUSSION

Petitioner contends (1) that Vallette's representation of Capital in the present action constitutes a conflict of interest warranting recusal; (2) that

---

[3] It is not entirely clear why Vallette withdrew its defense for petitioner although we assume it was because of the conservatorship proceedings.

[4] Vallette represented Capital in opposition to petitioner's request for relief from the stay without objection from petitioner.

[5] Specifically, the first amended cross-complaint alleges petitioner breached its contract with Cities by failing to provide certain soils reports, failing to pay for extra work performed by Cities and wrongfully withholding contract funds from Cities. It also alleges that at the time it entered into its subcontract with Cities, petitioner knew that Cities was the alter ego of another corporation which was in bankruptcy and knew or should have known that Cities could not or would not perform its contract and did not advise Capital. It also alleges that petitioner misrepresented Cities' performance under the contract in order to induce Capital to issue its bonds.

the waiver set forth in the March 6th letter did not amount to petitioner's consent for Vallette to use confidential information in an action against petitioner; (3) that Evidence Code section 915 prohibits the court from ordering disclosure of the letters as a condition to granting relief; and (4) that the Attorney General's office should be vicariously disqualified because of its association with Vallette and because of its own conflict of interest.

## DISQUALIFICATION OF VALLETTE

■■ Petitioner contends that he did not consent to Vallette using confidential information in an action against him for fraud and exoneration of Capital's bonds and that as his attorney's declaration demonstrates that confidential information pertaining to the allegations in the cross-complaint was disclosed to Vallette, the court erred in denying petitioner's motion to disqualify Vallette.[6] Vallette on the other hand contends there was never an attorney-client relationship between petitioner and Vallette; the information was not confidential in that it related to claims of other parties or to actions in which Vallette did not "appear" on behalf of petitioner; and the information was of the type which would be discoverable in any event or was communicated between adversaries.

California Rules of Professional Conduct, rule 4-101 prohibits an attorney from accepting employment adverse to a client or former client relating to a matter in reference to which he has obtained confidential information by reason of or in the course of his employment by such client or former client, without the informed and written consent of the client or former client. ■■ The purpose of the rule is not only to protect the confidential communications but the confidential relationship between an attorney and his client as well. (*Jacuzzi* v. *Jacuzzi Bros., Inc.* (1963) 218 Cal.App.2d 24, 28 [32 Cal.Rptr. 188].)

Analysis under this rule traditionally has been twofold. First, is the adverse employment related to a matter in reference to which the attorney

---

[6]Petitioner's declaration does not specifically state petitioner did not consent to the joint representation or the terms of Vallette's letter. Rather it states petitioner did not consent to Vallette using confidential information against petitioner in an action for fraud or exoneration of the bonds. However, petitioner's attorney's letter accepting the terms is not so limited. Similarly, on a different matter, petitioner does not state he was never advised about conflicts (which presumably would suggest his consent was not informed) but rather states *Vallette* did not advise him of conflicts. Because of the narrow language of this declaration, the trial court could have determined petitioner was fully advised by his personal attorney and authorized his attorney to agree to the terms set forth in Vallette's letter. Because we decide the case on different grounds, we need not decide the issue of whether petitioner gave informed consent. We do suggest, however, in the future, Vallette can avoid the present type of dispute by addressing in writing the advantages and disadvantages of this kind of joint representation and by obtaining the client's written consent even if the client has independent counsel to advise him.

obtained confidential information by reason of his former employment. If so, has the attorney obtained the informed and written consent of the client or former client.

■ California has adopted the substantial relationship test first developed in the federal courts to assist in the first part of the analysis. (*Global Van Lines, Inc.* v. *Superior Court* (1983) 144 Cal.App.3d 483, 488 [192 Cal.Rptr. 609].) Under this test if there is a substantial relationship between the former representation and the current matter, the court will presume confidential information pertinent to the current matter was disclosed. "This is the rule by necessity, for it is not within the power of the former client to prove what is in the mind of the attorney. Nor should the attorney have to 'engage in a subtle evaluation of the extent to which he acquired relevant information in the first representation and of the actual use of that knowledge and information in the subsequent representation.'" (*Id.,* at p. 489.)

■ The appropriateness of this rule is demonstrated by the present case. Here petitioner construes "substantial relationship" broadly to include all communications between petitioner's personal attorney and Vallette during the time period in which Vallette represented petitioner even though it is clear some of the communications were not intended to be confidential between an attorney and his client but rather were communications between opposing attorneys such as those letters tendering defense of certain actions or those communications pertaining to petitioner's request that Capital provide stop notice release bonds. Vallette, on the other hand, construes "substantial relationship" narrowly and claims that unless the communication specifically related to an action in which Vallette had entered an appearance on behalf of petitioner it is not confidential. To the contrary, any information provided to Vallette about the project would assist Vallette in its representation of petitioner and is the type of communication one generally could expect to occur between an attorney and his client. Moreover, as petitioner correctly notes, if there was even one confidential communication which relates to the current dispute, a basis for disqualification would exist.

This, however, is where we part company with petitioner. Petitioner has not established that any of the communications were made in confidence with a reasonable expectation the communication would not be shared with Vallette's other client, Capital. In *Christensen* v. *U.S. D. Court for Cent. D. of Cal.* (9th Cir. 1988) 844 F.2d 694, 698, the court interpreted and applied rule 4-101, concluding the substantial relationship test is not implicated unless the attorney was in a position where he could have received information that his former client might reasonably have assumed the attorney would withhold from his present client. In that case the law firm's current

client had previously been on the board of directors of the firm's former client as well as a partner in the law firm. Relying on *Allegaert* v. *Perot* (2d Cir. 1977) 565 F.2d 246, the Ninth Circuit found the former client could not have reasonably expected information it provided to the law firm would not be shared with his current client and thus no basis for disqualification under rule 4-101 existed.

In *Allegaert,* the law firm had at all times represented its current client, even during the time in which it also represented the former client which sought disqualification. In determining the substantial relationship test did not apply, the court noted: "Because Walston [the former client] necessarily knew that information given to [the law firms] would certainly be conveyed to their primary clients . . . the substantial relationship test is inapposite. Neither Walston nor anyone connected with it could have thought that the [firms were] representing Walston without [the primary client's] knowledge and approval, or that any information given to the law firms conceivably would have been held confidential from the primary clients of the firms." (*Id.,* at p. 250.) Three facts of critical importance to the court's conclusion in *Allegaert* were (1) the continuous, unbroken relationship between the law firm and its primary client, even during the time the firm also represented Walston; (2) Walston's knowledge of this ongoing relationship; and (3) Walston's independent counsel which advised it at all times.

Although the court in *Allegaert* was construing the American Bar Association's Rules of Professional Responsibility, its conclusion is no less compelling in the present case. Here at the time petitioner tendered defense of the various lawsuits to Capital, petitioner knew Vallette had already been retained by Capital to represent its interest. Petitioner knew when Vallette undertook to defend petitioner in the lawsuits that Vallette was representing Capital's interests in these lawsuits as well. At all times petitioner had personal counsel to advise him. There is no indication Vallette ever gave advice to petitioner. Moreover, while petitioner and Capital joined forces in relation to the suits instituted by other creditors, they were also adversaries or potential adversaries in that petitioner was also making claim under Capital's bonds. Thus, while certain communications between petitioner's counsel and Vallette pertained to the mutual interests of petitioner and Capital, others were clearly communications between opposing counsel.

In light of all of these facts, neither petitioner nor his personal counsel could have reasonably expected Vallette would withhold information provided to it from its primary client, Capital. The letter from Vallette specifically advising petitioner that the acceptance of the tender of defense on behalf of petitioner would not constitute a conflict of interest and that Capital retained the right to continue to use Vallette as its attorney in the

event of a dispute between Capital and petitioner only serves to reinforce our determination. Petitioner was put on notice that Vallette considered Capital its primary client and intended to continue to represent Capital even in the event of conflict with petitioner and thus petitioner had no reasonable expectation Vallette would keep confidential from Capital information provided by petitioner.

Our conclusion also finds support in California law. In *Croce* v. *Superior Court* (1937) 21 Cal.App.2d 18 [68 P.2d 369], the court held that an attorney who had previously represented several clients in an action could later represent one client against the other in an action even though it was substantially related to the prior representation. Relying on the joint-clients exception to the attorney-client privilege (Evid. Code, § 962) the court determined that as either client could require the attorney to disclose all information acquired in the former representation, no purpose would be served in not allowing the attorney to represent one client against the other. (See also, *Petty* v. *Superior Court* (1953) 116 Cal.App.2d 20, 30 [253 P.2d 28], attorney for joint clients ordinarily is not a depository for confidential conmunications from either client which ought to be withheld from the other.)

*Croce* was criticized in *E.F. Hutton & Company* v. *Brown* (S.D. Tex. 1969) 305 F.Supp. 371, 394. In that case, the court noted the failure of the *Croce* court was in not recognizing that the rule prohibiting conflicting interests is broader than the attorney-client privilege. "The evidentiary privilege and the ethical duty not to disclose confidences both arise from the need to encourage clients to disclose all possibly pertinent information to their attorneys, and both protect only the confidential information disclosed. The duty not to represent conflicting interests, on the other hand, is an outgrowth of the attorney-client relationship itself, which is confidential, or fiduciary, in a broader sense. Not only do clients at times disclose confidential information to their attorneys; they also repose confidence in them. The privilege is bottomed only on the first of these attributes, the conflicting-interests rule, on both." (*Ibid.,* fn. omitted.)

While we agree an attorney should not always be free to represent one former joint client against another merely because of the joint-client exception to the attorney-client privilege and we can easily envision situations where such action would seriously undermine the integrity of the attorney-client relationship, the present case is not such a situation. Here petitioner maintained an attorney-client relationship with his personal attorney. There is no evidence petitioner ever reposed confidence and trust in Vallette's firm or ever sought or obtained advice from Vallette but rather at all times looked solely to his personal attorney not only to advise him but to repre-

sent his interests vis-à-vis Vallette and Capital. Petitioner knew Vallette considered Capital its primary client and knew that in the event of a conflict between petitioner and Capital, Vallette would continue to represent Capital. Thus our conclusion is based on the specific facts present. Our conclusion would be significantly altered if petitioner had not been independently represented by counsel or if there was evidence that petitioner looked to both its personal counsel and Vallette for advice and counsel.[7]

■ "Before an attorney may be disqualified from representing a party in litigation because his representation of that party is adverse to the interest of a current or former client, it must first be established that the party seeking the attorney's disqualification was or is 'represented' by the attorney in a manner giving rise to an attorney-client relationship." (*Civil Service Com.* v. *Superior Court* (1984) 163 Cal.App.3d 70, 76-77 [209 Cal.Rptr. 159].) What must be shown is that the attorney has obtained knowledge of otherwise confidential information that if used in the present litigation would place the client at an unfair disadvantage. (*Johnson* v. *Superior Court* (1984) 159 Cal.App.3d 573, 579 [205 Cal.Rptr. 605].) "The right of a party to be represented in litigation by the attorney of his or her choice is a significant right (see *Lyle* v. *Superior Court* (1981) 122 Cal.App.3d 470, 481 . . .) and ought not to be abrogated in the absence of some indication the integrity of the judicial process will otherwise be injured or the adverse party will otherwise be unfairly disadvantaged by the use of confidential information obtained as a result of the earlier representation. [Citation.]" (*Id.*, at p. 580.)

■ Because we believe, under the facts of this case, petitioner will not be unfairly disadvantaged and no harm to the judicial process will occur if

---

[7] Both parties rely on *Elliott* v. *McFarland Unified School Dist.* (1985) 165 Cal.App.3d 562 [211 Cal.Rptr. 802]. In that case, the court refused to apply the substantial relationship test under rule 4-101, finding instead that the parties had waived the right to assert a presumption of confidentiality because of a joint powers agreement previously entered into by the parties. The agreement provided that all signatories to the agreement would utilize a particular law firm for legal services and specifically set forth a procedure to be followed in the event two signatories took contrary positions. The agreement, however, did not set forth what the parties' respective rights would be if a conflict of interest was discovered after the law firm had assumed joint representation in a particular case. The appellate court balanced the parties' respective interests and determined that before disqualification would be required, the party asserting disqualification would have to establish that confidential information had in fact been disclosed. *Elliott* does not explain how a party proves confidential information has in fact been given without disclosing the contents of the communications. It also has been criticized for applying a balancing test once it was determined there was a substantial relationship between the former representation and the current matter. (*River West, Inc.* v. *Nickel* (1987) 188 Cal.App.3d 1297, 1308 [234 Cal.Rptr. 33].) Because we decide that the nature of the former representation is such that petitioner had no expectation of confidentiality and no confidential relationship existed between petitioner and Vallette, we need not decide whether we agree with *Elliott* or *River West*.

Vallette is allowed to continue as counsel for Capital, the court did not abuse its discretion in denying petitioner's motion.

## ATTORNEY GENERAL

■ Petitioner seeks to disqualify the Attorney General because of its relationship with Vallette and also because of its own conflict of interests. Because we have determined Vallette is not disqualified, we do not address petitioner's first contention. We do determine, however, petitioner's second contention is without merit.

Petitioner contends the Attorney General should be disqualified because the Insurance Commissioner, as conservator of Capital, is, in essence, breaching its fiduciary duty to the creditors of Capital by joining with Vallette in seeking exoneration and rescission of Capital's bonds. Although petitioner's argument is unclear in this regard, we assume petitioner is contending the Attorney General's obligation to represent the public conflicts with its obligation to represent the Insurance Commissioner when the Insurance Commissioner is violating its duties. Even assuming this is true, petitioner has failed to establish the Insurance Commissioner has breached its fiduciary duties.

The Insurance Commissioner is not seeking complete exoneration or rescission of Capital's bonds to the detriment of Capital's creditors. Rather, the Commissioner is seeking to preserve the assets of Capital for the benefit of *all* creditors generally by contesting the validity of petitioner's claim against the bond and the letter of credit and by contesting the validity of certain other creditors' claims because of those creditors' relationship with Cities. The Commissioner has no obligation to accept petitioner's claim as valid when it has reason to believe otherwise. Indeed, the Commissioner clearly would be in breach of its fiduciary duty by not contesting petitioner's claim if it has reason to believe the claim is not valid.

Accordingly the trial court did not abuse its discretion in denying petitioner's motion to disqualify the Attorney General.

## IN CAMERA REVIEW OF LETTERS

■ Although we have determined petitioner's motion was properly denied, we nonetheless address the propriety of the court's recommendation to refer the matter to a referee to determine whether confidential information was disclosed. Petitioner contends Evidence Code section 915 precludes the court from reviewing the documents. We disagree.

Evidence Code section 915 states that, except in limited situations, a court may not require disclosure of information claimed to be privileged in order to rule on the claim of privilege. Here there has been no attempt to introduce the communications into evidence and no claim that the documents are or are not protected by the attorney-client privilege. Thus section 915 is not applicable.

■ More importantly, even if we were to assume the section has some facial applicability, the rule is not absolute. The rule is based on the notion that when there is a claim of attorney-client privilege, for example, it is neither customary nor necessary to review the contents of the communication in order to determine whether the privilege applies as the court's factual determination does not involve the nature of the communications or the effect of disclosure but rather the existence of the relationship at the time the communication was made, the intent of the client and whether the communication emanates from the client. (*People* ex rel. *Dept. of Public Works* v. *Glen Arms Estate, Inc.* (1964) 230 Cal.App.2d 841, 846-847, fn. 1 [41 Cal.Rptr. 303].) The rule does not preclude the court from reviewing the facts asserted as the basis for the privilege. (*Id.,* at p. 855.)

Additionally, courts have recognized, if necessary to determine whether an exception to the privilege applies, the court may conduct an in camera hearing notwithstanding Evidence Code section 915. (*Mavroudis* v. *Superior Court* (1980) 102 Cal.App.3d 594, 606 [162 Cal.Rptr. 724].) ■ Although we do not believe there was any need for an in camera hearing nor any need to submit the matter to a referee because of our determination petitioner had no reasonable expectation the information would not be shared with Capital and was specifically advised and consented to Vallette's continued representation of Capital, the court's recommendation in this regard was not prohibited by section 915 as such a hearing could have been helpful in determining whether, in light of the joint-client relationship existing between petitioner, Capital and Vallette, petitioner nonetheless had revealed information he intended Vallette to keep confidential from Capital and which, if used in the present case, would unfairly disadvantage petitioner.

## SANCTIONS

Capital requests this court to issue sanctions against petitioner pursuant to Code of Civil Procedure section 907. We decline to do so.

DISPOSITION

Petition for writ denied.

Dabney, Acting P. J., and Staniforth, J.,* concurred.

A petition for a rehearing was denied May 1, 1989, and on April 19, 1989, the opinion was modified to read as printed above. Petitioner's application for review by the Supreme Court was denied June 21, 1989.

---

* Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.