[No. H012341. Sixth Dist. Jan. 30, 1995.]

ZADOR CORPORATION, N.V., Cross-complainant and Appellant, v. C. K. KWAN, Cross-defendant and Respondent.

**COUNSEL**

Heller, Ehrman, White & McAuliffe, Curtis M. Caton, Michael J. Coffino and Michael L. Charlson for Cross-complainant and Appellant.

Wilson, Sonsini, Goodrich & Rosati, James A. Diboise, Robert A. Fabela and Peter M. Lefkowitz for Cross-defendant and Respondent.

**OPINION**

**ELIA, J.**—Zador Corporation, N.V., appeals after the trial court disqualified Heller, Ehrman, White & McAuliffe (Heller) from serving as Zador's counsel. For reasons we shall explain, we reverse.

### Facts and Procedural Background

In 1983, Zador purchased the "Platt Property." The Young family owned Zador. C. K. Kwan, acting as agent for the Young family, received the Platt Property on the Youngs' behalf. It was then transferred to Zador.

A partnership sold the Platt Property. James Claitor and Roy Bolton were principals in the partnership. Pursuant to the sales agreement, Zador was to convey 15 percent of its interest in the Platt Property to Claitor or a business entity as directed by Claitor. This 15 percent interest formed the basis for the underlying litigation.

In 1990, Bolton filed suit against Zador, Kwan, and Claitor. Bolton claimed he was an intended third party beneficiary of the agreement relating to the 15 percent interest. Bolton also alleged that defendants fraudulently transferred the property to a wholly owned Zador subsidiary.

Zador cross-complained against the seller partnership and its partners, including Claitor and Bolton. Zador alleged that the sellers sold the property at a grossly inflated price, thereby divesting Zador of its assets.

On May 1, 1990, Zador asked Heller to defend it. Heller had represented the Young family for about 10 years. When Kwan learned of the lawsuit, he requested indemnity from Zador because he acted as Zador's agent. On May 23, 1990, Heller met with Kwan and Amelia Mak, Zador's Hong Kong in-house counsel. It was confirmed that Heller would represent Kwan and Zador in the action.

On June 22, 1990, Kwan met with Heller. Heller presented Kwan with a waiver and consent form. Heller told Kwan that the conflicts letter was standard. Heller stated that clients were required to sign such a letter when Heller represented multiple parties in the same litigation.

The letter provided, in pertinent part:

"Based on the information that has been provided to us, we do not believe that our representation currently involves any actual conflict of interest. You should be aware, however, that our representation may in the future involve actual conflicts of interests if the interests of the Co-defendants become inconsistent with your interests. Should that occur, we will endeavor to apprise you promptly of any such conflict so that you can decide whether you wish to obtain independent counsel.

"Multiple representation may result in economic or tactical advantages. You should be aware, however, that multiple representation also involves significant risks. First, multiple representation may result in divided or at least shared attorney-client loyalties. Although we are not currently aware of any actual or reasonably foreseeable adverse effects of such divided or shared loyalty, it is possible that issues may arise as to which our representation of you may be materially limited by our representation of the Co-defendants.

"Furthermore, because we will be jointly retained by both you and the Co-defendants in this matter, in the event of a dispute between you and the Co-defendants, the attorney-client privilege generally will not protect communications that have taken place among all of you and attorneys in our firm. Moreover, pursuant to this 'Joint Client' arrangement, anything you disclose to us may be disclosed to any of the other jointly represented clients.

"In the event of a dispute or conflict between you and the Co-defendants, there is a risk that we may be disqualified from representing all of you absent written consent from all of you at that time. We anticipate that if such a conflict or dispute were to arise, we would continue to represent the subsidiary companies of Miramar Hotel & Investment Co., Ltd. (the 'Companies'), whose legal interests in this matter are aligned, notwithstanding any adversity between you and the Companies' interests. Among the Companies are Zador (California) Corporation, Zador Corporation N.V. and YCS Investments. *Accordingly, we are now asking that you consent to our continued and future representation of the Companies and agree not to assert any such conflict of interest or to seek to disqualify us from representing the Companies, notwithstanding any adversity that may develop.* By signing and returning to us the agreement and consent set forth at the end of this letter, you will consent to such arrangement and waive any conflicts regarding that arrangement. Notwithstanding such waiver and consent, depending on the circumstances, there remains some degree of risk that we would be disqualified from representing any of you in the event of a dispute.

"Notwithstanding these risks, you have advised us that in this matter at the present time you do not desire to seek other counsel but instead you desire that we represent multiple interests of yourself and the Co-defendants. Because the interests of the Co-defendants may become inconsistent with your interests, under the ethical standards discussed below we are required to bring this matter to your attention and to obtain your consent, as well as the consent of the Co-defendants, before representing you in the matter described above. . . .

"Accordingly, we request that you signify your informed written consent by signing and returning this letter to us. We encourage you to seek independent counsel regarding the import of this consent, if you so desire, and we emphasize that you remain completely free to seek independent counsel at any time even if you decide to sign the consent set forth below. . . ." (Italics added.)

After spending 20 minutes studying the form, Kwan signed it. After this meeting, Kwan met with Heller several times to discuss the case. Heller

interviewed Kwan, discussed Kwan's answer to the complaint, and prepared and responded to interrogatories on Kwan's behalf.

With respect to the interrogatories, Kwan had informed the Youngs that $4 million was a reasonable value for the Platt Property. However, according to the interrogatory response, "the Platt property had a value far less than the approximately $4.1 million price paid by Zador . . . ." Kwan objected to submitting this response. He believed $4.1 million was a fair price. However, at Heller's urging, Kwan endorsed the interrogatory response.

On August 7, 1990, Heller reviewed documents produced by Bolton. The documents suggested Kwan might have received money from the sellers during the Platt Property transaction. On August 8, 1990, Heller attorneys met with each other to discuss this information. On August 13, 1990, Heller informed Kwan that this information suggested a possible conflict between his interests and Zador's interests. Heller told Kwan that he needed to retain separate counsel. Kwan agreed. Kwan also reaffirmed his consent to Heller's continued representation of Zador.

In an August 20, 1990, letter, Heller confirmed its discussion with Kwan. Among other things, the letter stated, *"Consistent with your agreement and consent dated June 22, 1990, which you have recently reaffirmed, we will continue to represent the Co-defendants in this lawsuit."* (Italics added.)

On August 22, 1990, Wilson, Sonsini, Goodrich & Rosati (Wilson) advised Heller it was representing Kwan. Wilson requested a meeting with Heller. At the meeting, Wilson requested that Zador indemnify Kwan. Wilson said that if Zador sued Kwan, Wilson would move to disqualify Heller.

In a September 26, 1990, letter, Heller denied Kwan's request for indemnity. Heller explained that Kwan may have conspired to defraud Zador. However, Heller added that "[i]f at some point in the future it becomes clear that Dr. Kwan did not act in complicity with James Claitor, Roy Bolton and the other Cross-defendants, and is otherwise entitled to indemnity, we can revisit the indemnity issue at that time."

After a year of negotiations over the indemnity issue, the parties signed an indemnity agreement. Indemnity was limited to the extent that "Kwan has acted in good faith and in a manner he reasonably believed to be in the best interests of Zador." The indemnity agreement specifically referred to the possibility that Kwan may have "breached any of his duties" to Zador and expressly contemplated the possibility of litigation between Kwan and Zador.

Heller also drafted and signed a joint defense agreement with Wilson. In the agreement, it was acknowledged that Zador and Kwan had a "certain mutuality of interest in a joint defense . . . ." Zador, however, ultimately refused to sign the agreement.

In February 1991, Claitor cross-complained against Kwan for indemnity and contribution. The cross-complaint sought to transfer Claitor's liability to Zador to Kwan, among others.

In July 1992, Claitor was deposed. In his deposition, Claitor implicated Kwan in the conspiracy to defraud Zador. Heller invoked Kwan's duty to cooperate under the indemnity agreement and demanded an explanation. On April 15, 1993, Kwan and Wilson met with Heller. At the meeting, Kwan acknowledged that he had in fact profited from the Platt Property deal.

In July 1993, Zador formally withdrew from the indemnity agreement with Kwan. It also demanded refund of the sums it had paid for Kwan's separate defense.

On August 17, 1993, Heller amended its cross-complaint to name Kwan as a cross-defendant. Heller's claims against Kwan were based in part on the allegation that the Platt Property was overvalued.

In December 1993, Kwan moved to disqualify Heller. In January 1994, the trial court concluded that there was a substantial relationship between Heller's prior representation of Kwan and the current litigation. Accordingly, the motion to disqualify was granted.

Zador petitioned for a writ of mandate to this court. On March 1, 1994, we denied Zador's petition on the ground that Zador had an adequate legal remedy. On March 8, 1994, Zador filed its notice of appeal. On March 22, 1994, Zador petitioned for a writ of supersedeas or other appropriate stay order. On April 12, 1994, we entered an order staying proceedings below pending disposition of this appeal.

### Standard of Review

The authority to disqualify an attorney stems from the trial court's inherent power "[t]o control in furtherance of justice, the conduct of its ministerial officers, and of all other persons in any manner connected with a judicial proceeding before it, in every matter pertaining thereto." (Code Civ. Proc., § 128; *In re Complex Asbestos Litigation* (1991) 232 Cal.App.3d 572, 585 [283 Cal.Rptr. 732].) In reviewing a disqualification motion, we will

uphold the trial court's decision absent an abuse of discretion. (*Western Continental Operating Co.* v. *Natural Gas Corp.* (1989) 212 Cal.App.3d 752, 758 [261 Cal.Rptr. 100]; *Bell* v. *20th Century Ins. Co.* (1989) 212 Cal.App.3d 194, 198 [260 Cal.Rptr. 459].) "The trial court's exercise of this discretion is limited by the applicable legal principles and is subject to reversal when there is no reasonable basis for the action." (*In re Complex Asbestos Litigation, supra,* 232 Cal.App.3d at p. 585; see also *Bell* v. *20th Century Ins. Co., supra,* 212 Cal.App.3d at p. 198; *Mills Land & Water Co.* v. *Golden West Refining Co.* (1986) 186 Cal.App.3d 116, 126 [230 Cal.Rptr. 461].)

## Discussion

Appellant contends the trial court erred in granting the disqualification motion. Before addressing this contention, we first review the pertinent legal principles.

■ "The relation between attorney and client is a fiduciary relation of the very highest character, and binds the attorney to most conscientious fidelity—*uberrima fides.*" (*Cox* v. *Delmas* (1893) 99 Cal. 104, 123 [33 P. 836], italics in original; see also *Kornbau* v. *Evans* (1944) 66 Cal.App.2d 677, 685 [152 P.2d 651].) Among other things, the fiduciary relationship requires that the attorney respect his or her client's confidences. (Bus. & Prof. Code, 6068, subd. (e); *Anderson* v. *Eaton* (1930) 211 Cal. 113, 116 [293 P. 788].) It also means that the attorney has a duty of loyalty to his or her clients. (*Anderson* v. *Eaton, supra,* 211 Cal. 113, 116; *Dettamanti* v. *Lompoc Union School Dist.* (1956) 143 Cal.App.2d 715, 723 [300 P.2d 78].)

Because of this fiduciary relationship, it is improper for an attorney to assume a position which is inconsistent with the interests of present or former clients. (*Dettamanti* v. *Lompoc Union School Dist., supra,* 143 Cal.App.2d at p. 723; *David Welch Co.* v. *Erskine & Tulley* (1988) 203 Cal.App.3d 884, 890 [250 Cal.Rptr. 339].) In such circumstances, the present or former client may move the trial court to disqualify the attorney with the adverse interest. (*Weidekind* v. *Water Co.* (1887) 74 Cal. 386, 388 [19 P. 173].)

■ In deciding whether disqualification is required, the "substantial relationship" test is often utilized. "Under the 'substantial relationship' test: '[T]he former client need show no more than that the matters embraced within the pending suit wherein his former attorney appears on behalf of his adversary are substantially related to the matters or cause of action wherein the attorney previously represented him, the former client. The Court will assume that during the course of the former representation confidences were disclosed to the attorney bearing on the subject matter of the representation.

It will not inquire into their nature and extent. Only in this manner can the lawyer's duty of absolute fidelity be enforced and the spirit of the rule relating to privileged communications be maintained.'" (*River West, Inc.* v. *Nickel* (1987) 188 Cal.App.3d 1297, 1302-1303 [234 Cal.Rptr. 33], quoting *T.C. & Theatre Corp.* v. *Warner Bros. Pictures* (S.D.N.Y. 1953) 113 F.Supp. 265, 268-269.)

As noted above, the substantial relationship test determines whether client confidences were likely disclosed. Under the test, if there is a substantial relationship between the pending suit and the prior representation, then such disclosure is presumed. At this point, disqualification is justified.

■ However, when the prior representation involves joint clients, and the subsequent action relates to the same matter, the substantial relationship test adds nothing to disqualification analysis. This is because a substantial relationship between the former representation and the subsequent action is *inherent* in such situations. In other words, clients A and B are jointly represented by C until C discovers a conflict between the legal position of A and B. Client B retains separate counsel. Client A then sues Client B. In these circumstances, a substantial relationship will always exist between C's prior representation of B and the litigation between A and B. Accordingly, in this situation, the substantial relationship test does not "test" anything. It should not determine whether C should be disqualified from representing A.

In addition, although the substantial relationship test determines whether confidences were likely disclosed, in a joint client situation, confidences are necessarily disclosed. In fact, the joint client relationship is an exception to the attorney-client privilege. "Where two or more clients have retained or consulted a lawyer upon a matter of common interest, none of them, nor the successor in interest of any of them, may claim a privilege under this article as to a communication made in the course of that relationship when such communication is offered in a civil proceeding between one of such clients (or his [or her] successor in interest) and another of such clients (or his [or her] successor in interest)." (Evid. Code, § 962.)

"In California, the 'joint client' or 'common interest' exception [to the attorney-client privilege] applies only where 'two or more clients have retained or consulted a lawyer upon a matter of common interest,' in which event neither may claim the privilege in an action by one against the other. [Citations.]" (*Rockwell Internat. Corp.* v. *Superior Court* (1994) 26 Cal.App.4th 1255, 1267 [32 Cal.Rptr.2d 153]; see also *Hecht* v. *Superior Court* (1987) 192 Cal.App.3d 560, 567 [237 Cal.Rptr. 528].)

Accordingly, in such circumstances, the propriety of disqualification is not dependent upon the substantial relationship test. Rather, it generally

turns upon the scope of the clients' consent. We explain this conclusion below.

■ Not all conflicts of interest require disqualification. In some situations, the attorney may still represent the client if the client's consent is obtained. (*Ward* v. *Superior Court* (1977) 70 Cal.App.3d 23, 31 [138 Cal.Rptr. 532]; *River West, Inc.* v. *Nickel, supra,* 188 Cal.App.3d 1297, 1304-1310; *In re Lee G.* (1991) 1 Cal.App.4th 17, 34 [1 Cal.Rptr.2d 375]; see also Wolfram, Modern Legal Ethics (1986) § 7.2, p. 337.) "Giving effect to a client's consent to a conflicting representation might rest either on the ground of contract freedom or on the related ground of personal autonomy of a client to choose whatever champion the client feels is best suited to vindicate the client's legal entitlements." (Wolfram, Modern Legal Ethics, *supra,* § 7.2.2, p. 339.)

In some circumstances, informed client consent is required. For example, informed written consent is required before an attorney can jointly represent clients in the same matter. California Rules of Professional Conduct, rule 3-310(C)(1) requires an attorney to obtain each client's informed written consent before accepting representation of more than one client in a matter in which the interests of the clients potentially conflict. Similarly, rule 3-310(C)(2) requires an attorney to obtain each client's informed written consent before accepting or continuing representation of more than one client in a matter in which the interests of the clients actually conflict.

As the drafters of the rules explain, "Subparagraphs (C)(1) and (C)(2) are intended to apply to all types of legal employment, including the concurrent representation of multiple parties in litigation or in a single transaction or in some other common enterprise or legal relationship. . . . In such situations, for the sake of convenience or economy, the parties may well prefer to employ a single counsel, but a member must disclose the potential adverse aspects of such multiple representation (e.g., [Evid. Code,] § 962) and must obtain the informed written consent of the clients thereto pursuant to subparagraph (C)(1). Moreover, if the potential adversity should become actual, the member must obtain the further informed written consent of the clients pursuant to subparagraph (C)(2)." (Drafter's Notes, rule 3-310, Deering's Ann. Cal. Rules of Court, Rules Prof. Conduct (1994 supp.) p. 27.)

The Rules of Professional Conduct also require informed written consent before an attorney accepts "employment adverse to the client or former client where, by reason of the representation of the client or former client, the member has obtained confidential information material to the employment." (Cal. Rules Prof. Conduct, rule 3-310(E).)

The California Supreme Court examined the client consent issue in *Maxwell* v. *Superior Court* (1982) 30 Cal.3d 606 [180 Cal.Rptr. 177, 639 P.2d 248, 18 A.L.R.4th 333]. In that case, a defendant was charged with multiple robbery and murder counts. Some of the murder counts involved special circumstances, thereby raising the possibility that defendant could be sentenced to death. Defendant retained attorneys to provide a defense. As part of the retention agreement, defendant signed a fee contract. In the contract, defendant assigned, as the attorney's fees, " 'any and all right, title, interest, of any kind, nature and description throughout the world in and to the story of [his] entire life . . .' including all entertainment and commercial exploitation rights." (*Maxwell* v. *Superior Court, supra*, 30 Cal.3d at p. 610.) Under the contract, defendant was to receive 15 percent of the "net amount" realized by the exploitation. Defendant agreed to cooperate in the effort to exploit his life, and promised not to disclose his story to others except with counsel's consent, or as required by law or his defense. Defendant also agreed to waive the attorney-client privilege. Under the contract, defendant agreed that counsel could "(1) create damaging publicity to enhance exploitation value, (2) avoid mental defenses because, if successful, they might suggest [defendant's] incapacity to make the contract, and (3) see [defendant] convicted and even sentenced to death for publicity value." (*Id.* at p. 611.)

The contract also provided that " 'The Lawyers will raise every defense which they, in their best judgment based upon their experience feel is warranted by the evidence and information at their disposal and which, taking into consideration the flow of trial and trial tactics, is in [defendant's] best interests. The Lawyers will conduct all aspects of the defense of [defendant] as would a reasonably competent attorney acting as a diligent conscientious advocate." (*Maxwell* v. *Superior Court, supra*, 30 Cal.3d at p. 611, italics omitted.)

Upon its own motion, the trial court questioned defendant about the contract. Defendant indicated that he understood the contract provisions. He also indicated he was satisfied with his counsel's conduct. After considering psychiatric reports submitted, the trial court ruled that defendant had knowingly and willingly chosen not to seek outside advice, that he was satisfied with his attorneys, and that counsel's competency was not at issue. Nonetheless, the trial court decided counsel should be recused because of the inherent conflict created. Defendant petitioned for a writ of mandate to overturn the trial court's decision. (*Maxwell* v. *Superior Court, supra*, 30 Cal.3d at pp. 610-612.)

The Supreme Court granted defendant's petition. In so deciding, the court explained that "We stress that our opinion connotes no moral or ethical

approval of life-story fee contracts. We have addressed only this narrow question: May a criminal defendant (here charged with capital crimes) be denied his right to representation by retained counsel simply because of potential conflicts or ethical concerns even when he has asserted, after extensive disclosure of the risks, that he wishes to proceed with his chosen lawyer and no others? Our answer is No." (*Maxwell* v. *Superior Court, supra,* 30 Cal.3d at p. 622.)

Client consent was also addressed in *Cornish* v. *Superior Court* (1989) 209 Cal.App.3d 467 [257 Cal.Rptr.383]. In *Cornish,* a dispute arose between a contractor and its subcontractor. The contractor notified subcontractor's bonding company that contractor was seeking the penal sum on the bonds because of stop notices. The bonding company retained a law firm to investigate the validity of these claims. The law firm contacted the contractor and requested the contractor's records and cooperation. The contractor agreed. Subsequently several lawsuits were filed relating to the project. (*Id.* at pp. 471-472.)

The contractor tendered defense of some of the claims to the bonding company. In accepting the defense on the bonding company's behalf, the firm wrote the contractor that " '[i]f [bonding company] elects to re-tender the defense . . . or if [contractor] . . . and [bonding company] become adversaries in future litigation, it is expressly agreed that [bonding company's] counsel, whether [law firm] or another firm, shall be entitled to continue representation of [bonding company] and that no conflict of interest will be deemed to exist by reason of this firm's having provided a defense . . . .' " (*Cornish* v. *Superior Court, supra,* 209 Cal.App.3d at p. 472.)

Subsequently, the bonding company was placed in conservatorship by the Insurance Commissioner. The law firm advised contractor's attorney that it could no longer provide contractor with a defense. The bonding company then filed an action alleging that contractor had engaged in fraud, thereby entitling bonding company to rescind and exonerate its obligation under the bonds. The contractor's attorney demanded that the law firm recuse itself from the action due to the conflict. After the law firm refused, contractor moved to disqualify the firm. (*Cornish* v. *Superior Court, supra,* 209 Cal.App.3d at p. 473.)

In upholding the trial court's denial of the disqualification motion, *Cornish* cited *Christensen* v. *U.S. D. Court For Cent. D. of Cal.* (9th Cir. 1988) 844 F.2d 694, 698. In that case, the court decided that the substantial relationship test was not implicated unless the attorney might have received information that his or her former client would reasonably assume would be withheld from the law firm's present client.

*Cornish* also relied upon *Allegaert* v. *Perot* (2d Cir. 1977) 565 F.2d 246. In *Allegaert*, the court also found that the substantial relationship test did not apply "[b]ecause [the former client] necessarily knew that [the] information given to [the law firms] would certainly be conveyed to their primary clients . . . the substantial relationship test is inapposite. Neither [the former client] nor anyone connected with it could have thought that the . . . firms were representing [the former client] without [the primary client's] knowledge and approval, or that any information given to the law firms conceivably would have been held confidential from the primary clients of the firms." (*Id.* at p. 250.) According to *Cornish*, three facts were critical to *Allegaert's* conclusion. These were "(1) the continuous, unbroken relationship between the law firm and its primary client, even during the time the firm also represented [the former client]; (2) [the former client's] knowledge of this ongoing relationship; and (3) [the former client's] independent counsel which advised it at all times." (*Cornish* v. *Superior Court, supra*, 209 Cal.App.3d at p. 476.)

*Cornish* also relied upon *Croce* v. *Superior Court* (1937) 21 Cal.App.2d 18 [68 P.2d 369]. *Croce* held that an attorney who had previously represented several clients in an action could later represent one client against the other even though the action was substantially related to the prior representation. The court relied upon the joint-clients exception to the attorney-client privilege. According to *Croce*, since either client could require the attorney to disclose all information acquired in the former representation, no purpose would be served in not allowing the attorney to represent one client against the other.

*E. F. Hutton & Company* v. *Brown* (S.D.Tex. 1969) 305 F.Supp. 371, 394, criticized *Croce* for not recognizing that the rule prohibiting conflicting interests is broader than the attorney-client privilege. *Hutton* stated, "The evidentiary privilege and the ethical duty not to disclose confidences both arise from the need to encourage clients to disclose all possibly pertinent information to their attorneys [fn. omitted], and both protect only the confidential information disclosed. [Fn. omitted.] The duty not to represent conflicting interests, on the other hand, is an outgrowth of the attorney-client relationship itself, which is confidential, or fiduciary, in a broader sense. Not only do clients at times disclose confidential information to their attorneys; they also repose confidence in them. The privilege is bottomed only on the first of these attributes, the conflicting-interests rule, on both." (*Id.* at p. 394.)

After considering these authorities, *Cornish* explained, "While we agree an attorney should not always be free to represent one former joint client

against another merely because of the joint-client exception to the attorney-client privilege and we can easily envision situations where such action would seriously undermine the integrity of the attorney-client relationship, the present case is not such a situation. Here petitioner maintained an attorney-client relationship with his personal attorney. There is no evidence petitioner ever reposed confidence and trust in [the law firm] or ever sought or obtained advice from [the law firm] but rather at all times looked solely to [its] personal attorney not only to advise [it] but to represent [its] interests vis-à-vis [the law firm] and [the bonding company]. [The contractor] knew [the law firm] considered the [bonding company] its primary client and knew that in the event of a conflict between [the contractor] and [the bonding company], [the law firm] would continue to represent [the bonding company]." (*Cornish* v. *Superior Court, supra*, 209 Cal.App.3d at pp. 477-478.) For these reasons, *Cornish* concluded that disqualification was not required.

In *Elliott* v. *McFarland Unified School Dist.* (1985) 165 Cal.App.3d 562 [211 Cal.Rptr. 802], a teacher sued two school districts. The two districts were jointly represented by the same counsel pursuant to agreement. Subsequently, counsel discovered a conflict in their legal positions. Under the agreement, either party could secure its own separate counsel in the event of a conflict. Subsequently, one district retained separate counsel, and filed a cross-complaint against the other district. They also moved to disqualify the other district's counsel. The trial court denied the motion, and the Appellate Court affirmed. The court stated, "By signing the joint powers agreement [school district] waived its right to disqualify [the law firm] from representing other signatories to that agreement based on a presumption from a substantial relationship between [the law firm's] former representation and its current representation. It did not waive its right to disqualify [the law firm] if [law firm] acquired in the former representation confidential information pertaining to the current representation. However, [the school district] offered no substantial evidence that it had imparted confidential information to [the law firm] on this case." (*Id.* at p. 573.)

In *Elliott*, the agreement was not as detailed or explicit as the agreement here. The *Elliott* agreement provided, " 'In the event that two or more parties hereto are unable to resolve a legal issue between or among them without legal proceedings, the party or parties in contra-position to that of legal counsel employed as set forth herein on the legal issue involved shall secure its/their separate legal counsel at its/their own expense . . . .' " (*Elliott* v. *McFarland Unified School Dist., supra*, 165 Cal.App.3d at p. 568.) Based upon this provision, the court concluded, "[w]e believe the quoted provision . . . constitutes written consent to [the law firm's] continued representation . . . ." (*Ibid.*)

The court concluded, therefore, that disqualification was justified only if counsel violated rule 4-101, which prohibited an attorney from accepting employment adverse to former client, without informed written consent, " 'relating to a matter in reference to which he [or she] has obtained confidential information . . . .' " (*Elliott* v. *McFarland Unified School Dist.*, *supra*, 165 Cal.App.3d at p. 567, italics omitted.)

■ Having examined these authorities, we next consider the situation here. In this case, Heller advised Kwan that it would represent Kwan only if Kwan signed a detailed waiver. Kwan studied the form for 20 minutes and then signed it. By signing the form, Kwan waived the attorney-client privilege. Kwan was also advised that Heller would continue to represent Zador if a conflict existed. Kwan was advised that he had the right at any time to obtain separate counsel. Kwan also agreed to the following provision, "Accordingly, we are now asking that you consent to our continued and future representation of the Companies and agree not to assert any such conflict of interest or seek to disqualify us from representing the Companies, *notwithstanding any adversity that may develop*." (Italics added.)

Subsequently, after reviewing documents produced by Bolton, Heller decided a possible conflict existed. It advised Kwan to retain separate counsel. Kwan agreed. Heller also asked Kwan to reaffirm his consent to Heller's continued representation of Zador. Kwan *again agreed*. Heller confirmed this agreement in writing: "*Consistent with your agreement and consent dated June 22, 1990, which you have recently reaffirmed, we will continue to represent the Co-defendants in this lawsuit*." (Italics added.) Kwan raised no objections.

In July 1992, Claitor was deposed. In his deposition, Claitor implicated Kwan in the conspiracy to defraud Zador. Heller invoked Kwan's duty to cooperate under the indemnity agreement and demanded an explanation. On April 15, 1993, Kwan and Wilson met with Heller. At the meeting, Kwan acknowledged that he had in fact profited from the Platt Property deal.

In July 1993, Zador formally withdrew from the indemnity agreement with Kwan. It also demanded refund of the sums it had paid for Kwan's separate defense. On August 17, 1993, Zador amended its cross-complaint to name Kwan as a cross-defendant. Zador's claims against Kwan were based in part on the allegation that the Platt Property was overvalued. Finally, in December 1993, Kwan moved to disqualify Heller.

As these events show, Kwan consented to Heller's continued representation of Zador. The waiver and consent form was detailed. Kwan agreed not

to disqualify Heller "*notwithstanding any adversity that may develop.*" (Italics added.) When adversity did develop, Kwan obtained separate counsel but reaffirmed his agreement to the consent form and to Heller's continued representation of Zador.

Kwan contends he did not consent to being sued by Zador. He states that he did not believe that "any adversity" included the possibility of a lawsuit. We are not persuaded. In these circumstances, involving legal disputes between former joint clients, we believe that "any adversity" quite naturally includes litigation.

California law does not require that every possible consequence of a conflict be disclosed for a consent to be valid. Indeed, in *Maxwell* v. *Superior Court, supra,* 30 Cal.3d at page 622, the California Supreme Court recognized that "[w]aiver of the consequences of potential conflict was not inadequate simply because neither the court nor the agreement undertook the impossible burden of explaining separately every conceivable ramification."

The State Bar of California has reached a similar conclusion. In Formal Opinion No. 1989-115, the issue was whether a blanket waiver of the client's right to disqualify was ethically proper. In that matter, lead counsel requested local counsel's trial assistance. Local counsel represented several clients whose interests were presently or potentially adverse to lead counsel's client. Local counsel agreed to assist lead counsel but only if lead counsel's client waived its right to disqualify local counsel in any matter in which local counsel represented parties adverse to lead counsel's client. The committee decided such blanket waivers were not per se improper. The committee noted, "In addition, the nature of the subsequent conflict of interest may range from simply representing two clients in entirely unrelated matters to actually representing both sides in the same dispute. While a court would doubtless preclude a lawyer from representing both sides simultaneously [fn. omitted], the Committee believes that in such situation, *if the original waiver was informed, local counsel could withdraw from its representation of lead counsel's client and continue to represent its own client even if otherwise confidential information would be used against lead counsel's client.*" (Cal. Compendium on Prof. Responsibility, pt. IIA, State Bar Formal Opn. No. 1989-115, p. 2, italics added.)

Accordingly, we conclude that Kwan consented to Heller's continued representation of Zador "notwithstanding any adversity" that developed. The consent form was detailed. Kwan subsequently reaffirmed his consent. In September 1990, Wilson said it would move to disqualify Heller if Zador sued Kwan. Thus, over three years before the motion to disqualify was filed, it was recognized that litigation between Zador and Kwan might ensue.

Although this case differs from *Cornish* because *Cornish* emphasized that the former client at all times retained independent counsel, we do not believe this difference is controlling. In *Cornish*, as here, there was a continuous relationship between the law firm and the ongoing client Zador. In *Cornish*, as here, the former client knew about this ongoing relationship. Most importantly, in this case, unlike *Cornish*, there was a *detailed consent form* in which Kwan explicitly consented to Heller's continued representation of Zador. Likewise, the former client's consent in *Elliott* was not nearly as encompassing as the consent form here.

In addition, we may consider Kwan's delay in bringing the motion. Motions to disqualify are often used as a tactical device to delay litigation. ■ "Where the party opposing the motion can demonstrate prima facie evidence of unreasonable delay in bringing the motion causing prejudice to the present client, disqualification should not be ordered. The burden then shifts back to the party seeking disqualification to justify the delay. [Citation.] Delay will not necessarily result in the denial of a disqualification motion; the delay and the ensuing prejudice must be extreme. [Citation.]" (*Western Continental Operating Co.* v. *Natural Gas Corp., supra*, 212 Cal.App.3d at pp. 763-764.)

■ In this case, Kwan explains that he promptly moved to disqualify Heller soon after Zador filed suit against him. Although this is true, it is also true that the possibility of litigation was evident nearly three years before Kwan filed his motion. In 1990, Heller advised Kwan of the potential conflict. Kwan retained separate counsel. Further, Kwan's counsel threatened to disqualify Heller if Zador sued Kwan. Thus, it is a possibility that the motion to disqualify was used as a litigation tactic. Finally, we note that there is some indication that Kwan all along realized that his position conflicted with the position of Zador. If he did not, then he should have, since he admitted profiting from the overvalued Platt Property transaction.

"Motions to disqualify counsel present competing policy considerations. On the one hand, a court must not hesitate to disqualify an attorney when it is satisfactorily established that he or she wrongfully acquired an unfair advantage that undermines the integrity of the judicial process and will have a continuing effect on the proceedings before the court. [Citations.] On the other hand, it must be kept in mind that disqualification usually imposes a substantial hardship on the disqualified attorney's innocent client, who must bear the monetary and other costs of finding a replacement. A client deprived of the attorney of his [or her] choice suffers a particularly heavy penalty where, as appears to be the case here, his attorney is highly skilled in the relevant area of the law." (*Gregori* v. *Bank of America* (1989) 207 Cal.App.3d 291, 300 [254 Cal.Rptr. 853].)

"Additionally, as courts are increasingly aware, motions to disqualify counsel often pose the very threat to the integrity of the judicial process that they purport to prevent. [Citation.] Such motions can be misused to harass opposing counsel [citation], to delay the litigation [citation], or to intimidate an adversary into accepting settlement on terms that would not otherwise be acceptable. [Fn. omitted.] [Citations.] In short, it is widely understood by judges that 'attorneys now commonly use disqualification motions for purely strategic purposes . . . .' [Fn. omitted.] [Citations.]" (*Gregori* v. *Bank of America, supra,* 207 Cal.App.3d at pp. 300-301.)

Although we review the trial court's findings under an abuse of discretion standard, that standard does not assist us when the trial court employed the wrong legal analysis. "The trial court's exercise of this discretion is limited by the applicable legal principles and is subject to reversal when there is no reasonable basis for the action." (*In re Complex Asbestos Litigation, supra,* 232 Cal.App.3d at p. 585; see also *Bell* v. *20th Century Ins. Co., supra,* 212 Cal.App.3d at p. 198; *Mills Land & Water Co.* v. *Golden West Refining Co., supra,* 186 Cal.App.3d at p. 126.) In this case, the trial court applied the substantial relationship test to disqualify Heller. In these circumstances, that test was not determinative. Because Kwan consented to Heller's continued representation of Zador "notwithstanding any adversity that developed," the trial court should have denied the disqualification motion.

### Disposition

The judgment is reversed. The April 12, 1994, order staying proceedings below is lifted. Costs on appeal to Zador.

Premo, Acting P. J., and Bamattre-Manoukian, J., concurred.

A petition for a rehearing was denied February 17, 1995.