Filed 2/26/16 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP | B256314 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No.YC067332) |
| v. | |
| J-M MANUFACTURING CO., INC., | ORDER MODIFYING OPINION AND DENYING REHEARING |
| Defendant and Appellant. | [NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on January 29, 2016, be modified as follows:

1.      On page 2, line 6 of the first paragraph, delete the words "a plaintiff" and insert the words "an adverse party" between the words "representing" and "in" so the sentence reads:

Sheppard Mullin was disqualified from that litigation because, without obtaining informed consent from either client, Sheppard Mullin represented J-M, the defendant in the litigation, while simultaneously representing an adverse party in that case, South Tahoe Public Utility District (South Tahoe), in unrelated matters.

2.      On page 28 insert a footnote after the word "conflict" at the end of the last sentence in the last paragraph.

These cases are distinguishable in that none of them involved an actual conflict.[9]

[9] In *Slovensky*, the court accepted as true the plaintiff's allegations that her former attorneys breached their fiduciary duty by failing to disclose that they were settling a

number of plaintiffs' cases together in a global settlement.  No actual conflict was demonstrated.  (142 Cal.App.4th at p. 1534.)

     3.     On page 29, insert a footnote after the word "irrelevant" in the last sentence of the first paragraph.

J-M's actual damages as result of Sheppard Mullin's breach are irrelevant.[10]

[10] We recognize that disgorgement, when sought as a tort remedy in cases not involving a serious ethical breach, may require evidence of actual damages to avoid providing the client with a windfall.  (See, e.g., *Frye v. Tenderloin Housing Clinic, Inc.* (2006) 38 Cal.4th 23, 48; *Slovensky*, *supra*, 142 Cal.App.4th at pp. 1535-1536.)  When a serious ethical breach is at issue, however, an attorney may not recover fees for services rendered.  It makes no difference whether the fees have already been collected from the client or if the fees have yet to be paid.

The petition for rehearing is denied.

---

WILLHITE, J., Acting P.J.         COLLINS, J.         ZELON, J.[*]

---

[*] Associate Justice of the Court of Appeal, Second District, Division Seven, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 1/29/16 (unmodified version)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP<br><br>Plaintiff and Respondent,<br><br>v.<br><br>J-M MANUFACTURING CO., INC.,<br><br>Defendant and Appellant. | B256314<br><br>(Los Angeles County<br>Super. Ct. No. YC067332) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Stuart Rice, Judge. Reversed and remanded.

Greines, Martin, Stein & Richland, Kent L. Richardson, Barbara W. Ravitz, and Jeffrey E. Raskin for Defendant and Appellant.

Gibson, Dunn & Crutcher, Kevin S. Rosen, Theane Evangelis, and Heather L. Richardson for Plaintiff and Respondent.

## INTRODUCTION

Appellant J-M Manufacturing Company, Inc. (J-M) appeals from a judgment in favor of its former attorneys, Sheppard, Mullin, Richter & Hampton, LLP (Sheppard Mullin). Sheppard Mullin sought recovery of attorney fees relating to litigation in which Sheppard Mullin represented J-M. Sheppard Mullin was disqualified from that litigation because, without obtaining informed consent from either client, Sheppard Mullin represented J-M, the defendant in the litigation, while simultaneously representing a plaintiff in that case, South Tahoe Public Utility District (South Tahoe), in unrelated matters. J-M argued that its engagement agreement with Sheppard Mullin was unenforceable because it was illegal and it violated the public policy embodied in the California Rules of Professional Conduct Rule 3-310 (Rule 3-310),[1] which bars simultaneous representation of adverse clients. J-M argued that as a result of Sheppard Mullin's violation, J-M did not owe Sheppard Mullin outstanding attorney fees and Sheppard Mullin should return to J-M all attorney fees paid pursuant to the agreement.

The trial court ordered the case to arbitration based on the parties' written engagement agreement. A panel of three arbitrators found that the agreement was not illegal, denied J-M's request for disgorgement of fees paid, and ordered J-M to pay Sheppard Mullin's outstanding fees. The trial court confirmed the award and J-M appealed, arguing that the trial court enforced an illegal contract in violation of public policy.

Under California law, because J-M challenged the legality of the entire agreement, the issue of illegality was for the trial court, rather than the arbitrators, to decide. The undisputed facts establish that Sheppard Mullin violated the requirements of Rule 3-310 by simultaneously representing J-M and South Tahoe. Sheppard Mullin failed to disclose the conflict to either J-M or South Tahoe, and it failed to obtain the informed written consent of either client to the conflict. The representation of both parties without informed written consent is contrary to California law and contravenes the public policy

---

[1] All further references to a "Rule" refer to the California Rules of Professional Conduct unless otherwise indicated.

2

embodied in Rule 3-310. Because Sheppard Mullin's representation of J-M violated Rule 3-310 and public policy, the trial court erred by enforcing the contract between the parties and entering judgment on the arbitration award based on that contract. We therefore reverse the judgment.

J-M also seeks disgorgement of all fees paid to Sheppard Mullin. Sheppard Mullin, on the other hand, argues that under principles of quantum meruit, it is entitled to attorney fees despite its violation of the Rules of Professional Conduct. We follow established California law and find that Sheppard Mullin is not entitled to fees for the work it did while violating Rule 3-310, which exemplifies the inviolate duty of loyalty an attorney owes a client. Because the point at which the actual conflict arose is unclear from the record, however, we remand for a factual finding on that issue.

## FACTUAL AND PROCEDURAL BACKGROUND

We take portions of our factual history from the declarations submitted to the arbitration panel, which are in the record on appeal.

### A. The underlying litigation: the Qui Tam Action

In 2006, a qui tam action was initiated against J-M and Formosa Plastics Corporation U.S.A. on behalf of approximately 200 real parties in interest, including the United States, seven states, and other state and local government entities. (*United States ex rel. Hendrix v. J-M Manufacturing Company, Inc.*, United States District Court for the Central District of California, case No. 5:06-cv-00055-GW-PJW (Qui Tam Action).) J-M manufactures polyvinyl chloride (PVC) pipe. The Qui Tam Action alleged that J-M falsely represented to its customers that the PVC pipe products it sold conformed to applicable industry standards for water works parts. It also alleged that, contrary to this representation, J-M was aware of numerous tests proving that its PVC pipe regularly failed to meet the minimum longitudinal tensile-strength requirements. The complaint demanded over $1 billion in damages.

Another law firm represented J-M in the initial phases of the Qui Tam Action. By February 2010, the complaint was unsealed, and numerous governmental entities were filing notices of intervention. Camilla Eng, J-M's general counsel, invited Sheppard

Mullin attorneys Bryan Daly and Charles Kreindler to meet with her and J-M chief executive officer Walter Wang to discuss replacing J-M's current counsel. They discussed the experience of the Sheppard Mullin attorneys in qui tam actions and their proposed defense strategy. J-M retained Sheppard Mullin shortly thereafter.

Sheppard Mullin represented J-M in the Qui Tam Action for sixteen months, litigating motions, conducting discovery, reviewing documents, and conducting an extensive internal investigation at J-M. It billed J-M nearly $3.8 million for approximately 10,000 hours of work.

### B.     Conflict waiver provision

In March 2010, before J-M retained Sheppard Mullin, Daly and Kreindler ran a conflicts check to determine whether Sheppard Mullin had represented any of the real parties in interest identified in the Qui Tam Action. They discovered that Jeffrey Dinkin, a Sheppard Mullin labor-and-employment partner, had done work for South Tahoe, one of the municipal intervenors in the Qui Tam Action. Dinkin stated in a declaration that he began working with South Tahoe early in his career when he worked at a different firm. When he moved to Sheppard Mullin in 2002, he brought South Tahoe with him as a client. South Tahoe signed an engagement agreement with Sheppard Mullin in 2002, and it renewed that agreement in 2006. The agreement had a broad advance conflict waiver provision similar to the one in the J-M agreement, discussed below. Dinkin did occasional, as-needed labor and employment work for South Tahoe between 2006 and November 2009.

When Sheppard Mullin's conflict check for J-M revealed that South Tahoe was a client, Daly and Kreindler consulted with an assistant general counsel to Sheppard Mullin. That unidentified attorney informed them that South Tahoe had "agreed to an advance conflict waiver and that Sheppard Mullin had done no work for [South Tahoe] for the previous five months (since November 2009)." In addition, Daly and Kreindler discussed the issue with Ronald Ryland, Sheppard Mullin's general counsel, "who analyzed [South Tahoe's] conflict waiver and informed us that it allowed us to represent J-M in the Qui Tam Action."

4

Daly met with Eng for two hours on March 4, 2010, to discuss a draft engagement agreement. The draft contained the advance conflict waiver provision that ultimately was included in the final engagement agreement. It stated, "Conflicts with Other Clients. Sheppard, Mullin, Richter & Hampton LLP has many attorneys and multiple offices. We may *currently or in the future represent one or more other clients* (*including current, former, and future clients*) *in matters involving* [*J-M*]. We undertake this engagement on the condition that we may represent another client in a matter in which *we do not represent* [J-M], even if the interests of the other client are adverse to [J-M] (including appearance on behalf of another client adverse to [J-M] in litigation or arbitration) and can also, if necessary, examine or cross-examine [J-M] personnel on behalf of that other client in such proceedings or in other proceedings to which [J-M] is not a party *provided* the other matter is not substantially related to our representation of [J-M] and in the course of representing [J-M] we have not obtained confidential information of [J-M] material to representation of the other client. *By consenting to this arrangement, [J-M] is waiving our obligation of loyalty to it so long as we maintain confidentiality and adhere to the foregoing limitations*. We seek this consent to allow our Firm to meet the needs of existing and future clients, to remain available to those other clients and to render legal services with vigor and competence. Also, if an attorney does not continue an engagement or must withdraw therefrom, the client may incur delay, prejudice or additional cost such as acquainting new counsel with the matter." (Italics added except for word "provided.") We refer to this as the "conflict waiver provision."

According to Daly, Eng carefully reviewed the entire draft agreement with him, and she "did not ask me any questions or express any concern about the advance conflict waiver." Eng declared that Sheppard Mullin attorneys never discussed the conflict waiver provision with her, nor did they explain it. Eng also said the Sheppard Mullin attorneys assured her there were no conflicts in representing J-M in the Qui Tam Action. J-M's practice was to ensure that its outside attorneys had neither potential nor actual conflicts of interest. Although Eng made a number of handwritten edits related to the fee provisions, and also edited the paragraph preceding the conflict waiver provision, she did

5

not edit the conflict waiver provision. She ultimately executed the engagement agreement (the Agreement) on March 8, 2010, and sent it to Daly by email.

### C. South Tahoe raises the conflict of interest in the Qui Tam Action

Dinkin began actively working for South Tahoe again on March 29, 2010. Between March 2010 and May 2011, Sheppard Mullin billed South Tahoe for 12 hours of work, including telephone conversations and work on employment matters.

In March 2011, Day Pitney, counsel for South Tahoe in the Qui Tam Action, wrote a letter to Sheppard Mullin asserting that Sheppard Mullin had a conflict as a result of its simultaneous representation of J-M and South Tahoe. In response to the Day Pitney letter, Sheppard Mullin took the position that South Tahoe had agreed to an advance conflict waiver in its engagement agreement with Sheppard Mullin and therefore no conflict existed. Day Pitney's position was that there was an actual conflict. In April 2011, Day Pitney informed Sheppard Mullin that South Tahoe planned to bring a motion to disqualify Sheppard Mullin from the Qui Tam Action.

According to Eng's declaration submitted in the arbitration proceedings, she first heard about the conflict with South Tahoe on April 20, 2011, which she asserts was about 50 days after Day Pitney first contacted Sheppard Mullin about the conflict. Eng stated that Sheppard Mullin did not inform J-M that counsel for South Tahoe had contacted Sheppard Mullin about a potential disqualification motion because of the conflict until after the disqualification motion was filed.

Eng also stated that she first learned about the results of the March 2010 conflicts check on June 22, 2011, when she read in Sheppard Mullin attorneys' declarations that the conflicts check had revealed South Tahoe as a client. She declared that Sheppard Mullin never requested a conflict waiver from J-M in light of the South Tahoe conflict, and had Sheppard Mullin requested it, J-M would have declined.

### D. Sheppard Mullin is disqualified as counsel in the Qui Tam Action

South Tahoe's disqualification motion in the Qui Tam Action was heard on June 6, 2011. The district court tentatively ruled that the advance waiver in South Tahoe's engagement agreement with Sheppard Mullin was invalid. In its tentative ruling, the

6

court cited Rule 3-310(C)(3), which bars an attorney from representing clients in adverse positions without the informed written consent of each client.[2] The court referred to the engagement agreement letters between Sheppard Mullin and South Tahoe, and said that "the prospective waivers contained within the 2002 and 2006 letters were ineffective to indicate South Tahoe's informed consent to the conflict at issue here." The court added, "The Court cannot conclude that South Tahoe was in any way close to 'fully informed'" about the conflict with J-M.

The court rejected Sheppard Mullin's suggestion that it could drop South Tahoe as a client and remain counsel for J-M in the Qui Tam Action, citing *American Airlines, Inc. v. Sheppard, Mullin, Richter & Hampton* (2002) 96 Cal.App.4th 1017, 1037 (*American Airlines v. Sheppard Mullin*): "A lawyer may not avoid the automatic disqualification rule applicable to concurrent representation of conflicting interests by unilaterally converting a present client into a former client." The parties suggested bifurcating South Tahoe from the Qui Tam Action, with separate counsel for J-M working on that portion of the case. The hearing was continued to give the parties an opportunity to determine if that was a viable solution.

On June 9, 2011, Sheppard Mullin sent a letter to South Tahoe that began, "We write to address the long-standing relationship between the [South Tahoe Public Utility] District and our Firm. We have been pleased to provide labor advice to you for the last 9 years." Sheppard Mullin offered to "promptly pay to the District the sum of $100,000" and to "provide up to 40 hours of free labor and employment legal advice and services." In return, Sheppard Mullin asked that South Tahoe "consent to the Firm's continued representation of J-M in the pending federal district court action and any other state or federal action that the District and J-M may be involved in." South Tahoe declined on June 16, 2011. On July 1, Sheppard Mullin increased its offer to $250,000 and 40 hours

---

[2] Rule 3-310(C)(3) states, "A member shall not, without the informed written consent of each client . . . .  Represent a client in a matter and at the same time in a separate matter accept as a client a person or entity whose interest in the first matter is adverse to the client in the first matter."

of employment work in exchange for a conflict waiver. South Tahoe's response is not in the record, but it appears that the offer was rejected. Meanwhile, J-M rejected the proposal to bifurcate South Tahoe from the Qui Tam Action with separate counsel defending that portion of the case.

On July 14, 2011, the district court granted South Tahoe's motion to disqualify Sheppard Mullin.

### E. The present action

After Sheppard Mullin was disqualified, J-M took the position that J-M was not required to pay Sheppard Mullin any fees that were outstanding at the time of the disqualification. J-M also demanded that Sheppard Mullin return all fees relating to the Qui Tam Action that J-M had already paid.

In June 2012, Sheppard Mullin filed an action against J-M for specific performance, breach of contract, account stated, services rendered, and quantum meruit. It sought approximately $1.3 million as payment for services rendered to J-M in the Qui Tam Action and related matters. It also sought specific performance of the arbitration provision in the Agreement. J-M cross-complained for breach of contract, an accounting, breach of fiduciary duty, and fraudulent inducement. It also sought disgorgement of fees previously paid to Sheppard Mullin.

Sheppard Mullin petitioned for an order compelling arbitration. J-M opposed arbitration, partly on the basis that the entire Agreement containing the arbitration provision was illegal and void as against public policy because Sheppard Mullin's conflict of interest between J-M and South Tahoe violated Rule 3-310(C)(3). J-M argued that the court was required to determine whether the contract was enforceable before sending the case to arbitration, because "the Court has an *independent duty* to ensure that it does not use its power to enforce an illegal contract."

The trial court granted Sheppard Mullin's motion to compel arbitration. The court noted that the parties "contract[ed] out of the procedural requirements of the Federal Arbitration Act (FAA) . . . by providing that California law applies to disputes arising out of the subject retainer agreement." The court rejected J-M's argument that the contract

8

was unenforceable based on illegality, instead interpreting J-M's arguments as arising under the doctrine of fraudulent inducement: "[J-M] argues that *circumstances unbeknown to it* at the time of signing the agreement, i.e. [Sheppard Mullin's] alleged conflict of interest, caused the *entire* retainer agreement to be unenforceable. Thus, [J-M] *knew what it* was signing, but [Sheppard Mullin] allegedly induced such consent by fraudulent means. . . ." The court found that J-M had alleged fraud in the inducement, and the issue should be presented to the arbitrator. J-M's petition for writ of mandate challenging this ruling was denied.

### F.    Arbitration

Pursuant to the terms of the arbitration provision, the arbitration was conducted before a panel of three arbitrators. The parties stipulated that J-M waived any challenge to the value or quality of Sheppard Mullin's work in the Qui Tam Action and any claim for costs (fees included) associated with replacing Sheppard Mullin in the Qui Tam Action.

The arbitrators' final award considered the claimed ethical violation and "fraudulent concealment of the conflict." The arbitrators found "that the better practice would have been [for Sheppard Mullin] to disclose the full South Tahoe situation to J-M, and seek J-M's waiver of it." But the arbitrators concluded that they need not decide whether Sheppard Mullin's failure to seek such a waiver constituted an ethical violation, and for purposes of their analysis assumed that the ethical violation occurred. The arbitrators rejected J-M's claim for fraudulent concealment, based on their finding that Sheppard Mullin honestly and in good faith believed that no conflict existed when it undertook J-M's representation in the Qui Tam Action.

The arbitrators found the assumed ethical violation did not require automatic fee disgorgement or forfeiture. Instead, they engaged in an equitable weighing of whether the ethical violation was serious or egregious. The arbitrators concluded that Sheppard Mullin's conduct was not so serious or egregious as to make disgorgement or forfeiture of fees appropriate. They also found that Sheppard Mullin's representation of South Tahoe involved a matter that was unrelated to the subject of the J-M representation, and

9

therefore the conflict did not pervade the whole relationship with J-M or go to the heart of Sheppard Mullin's representation of J-M.

The arbitrators awarded Sheppard Mullin $1,118,147 in unpaid fees, pre-award interest of $251,471, and interest of $302 per day from January 8, 2014 until the date of the award against J-M. They awarded no recovery to J-M from Sheppard Mullin.

### G.      Petitions to confirm or vacate the award

Sheppard Mullin petitioned the trial court to confirm the arbitration award; J-M petitioned the court to vacate the award, again arguing that Sheppard Mullin violated Rule 3-310(C)(3), and sought an order requiring Sheppard Mullin to disgorge the fees it received from J-M. The trial court confirmed the award. It found the arbitrators did not exceed their powers in that the Agreement was not illegal or void and the arbitration award did not violate public policy or a statutory right. The court concluded that a violation of Rule 3-310 did not render the entire retainer agreement illegal, void, or unenforceable. It reasoned that whether an attorney should be entitled to attorney fees despite the existence of an ethical violation was at the heart of the determination made by the arbitrators, and that the court could not disrupt the legal and factual findings of the arbitrators.

The court entered judgment confirming the arbitration award on March 18, 2014. This timely appeal by J-M followed.

### DISCUSSION

### A.      Standard of review

"On appeal from an order confirming an arbitration award, we review the trial court's order (not the arbitration award) under a de novo standard." (*Lindenstadt v. Staff Builders, Inc.* (1997) 55 Cal.App.4th 882, 892 fn. 7 (*Lindenstadt*).) This is "the standard of review that governs a trial court's review of an arbitrator's decision where one of the parties claims that the entire contract or transaction underlying the award is illegal." (*Ibid.*) This is such a case.

10

**B.    Where a party challenges an entire contract as illegal or in violation of public policy, the question of enforceability is for the court**

A central issue in this case is the court's role where a party has alleged that an entire contract, rather than a portion of a contract, is unenforceable because it violates public policy.  Here, J-M has challenged the entire Agreement—rather than just a portion—as unenforceable.[3]  J-M argues that the trial court should not have confirmed the arbitration award, because by doing so the court enforced a contract that violates California's public policy as articulated in the Rules of Professional Conduct for attorneys.

Sheppard Mullin, on the other hand, argues that the arbitration award was properly confirmed because a court's role in reviewing arbitration awards is extremely limited.  Following arbitration, review is typically limited to the grounds set forth in Code of Civil Procedure section 1286.2 (section 1286.2), which provides that an arbitration award may be vacated only if the trial court makes particular findings, such as determining that the award was procured by fraud or corruption, the rights of the parties were substantially prejudiced by the actions of the arbitrators, or "the arbitrators exceeded their powers and the award cannot be corrected without affecting the merits of the decision upon which the controversy submitted."  (§ 1286.2.)

Determining whether federal or state law governs the Agreement is crucial to whether the court or the arbitrators should have decided if the Agreement was enforceable, and therefore how we review that decision.  The trial court held that this question was properly presented to the arbitrators, noting that *Phillips v. Sprint PCS* (2012) 209 Cal.App.4th 758 (*Phillips*) holds that a "challenge . . . that contests the

---

[3] In its opposition to Sheppard Mullin's petition to compel arbitration, J-M argued the Agreement was illegal and void as a violation of public policy because of Sheppard Mullin's conflict of interest while it represented J-M.  In its petition to vacate the arbitration award, J-M again argued the Agreement was "void and unenforceable" because of Sheppard Mullin's violation of Rule 3-310.  On appeal, J-M argues that "the trial court erred in confirming the arbitration award, thereby enforcing an illegal contract that contravenes . . . public polic[y]."

validity of the agreement as a whole, is decided by the arbitrator." (*Id.* at p. 774.) *Phillips*, however, and the U.S. Supreme Court case upon which it relied, *Buckeye Check Cashing, Inc. v. Cardegna* (2006) 546 U.S. 440 (*Buckeye*), were governed by the Federal Arbitration Act (FAA; 9 U.S.C. § 1, et seq.), not California law. (See *Phillips*, *supra*, 209 Cal.App.4th at p. 764 [noting that under the terms of the contract at issue, "the Federal Arbitration Act (FAA), not California law, 'govern[s] all questions of whether a claim is subject to arbitration.'"]; *Buckeye*, *supra*, 546 U.S. at pp. 445-446 [as a matter of "substantive federal arbitration law," "the issue of the contract's validity is considered by the arbitrator in the first instance"].)

However, the Agreement states that J-M "agrees that this agreement will be governed by the laws of California without regard to its conflict rules." Where the parties agree that California law governs the contract, the FAA does not apply. (*Mastick v. TD Ameritrade, Inc.* (2012) 209 Cal.App.4th 1258, 1264 (*Mastick*); see also *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior University* (1989) 489 U.S. 468, 470 [California arbitration law is not preempted by the FAA where the parties have agreed that their arbitration agreement will be governed by California law].) Cases applying the FAA, therefore, are not controlling here.

Under California law, a challenge to the legality of an entire contract that contains an arbitration provision must be determined by the trial court, not the arbitrator. "The power of the arbitrator to determine rights under a contract is *dependent upon the existence of a valid contract* under which this right might arise, and the question of the validity of the basic contract is essentially a *judicial question*, which cannot be finally determined by an arbitrator." (1 Witkin, Summary 10th (2005) Contracts, § 450, p. 490, citing *Loving & Evans v. Blick* (1949) 33 Cal.2d 603, 610 (*Loving*).) And if a party challenges the enforceability of a contract after arbitration in a motion to vacate the arbitration award, the court should "review[ ] the evidence de novo to determine whether the arbitration award was based on illegal agreements or transactions." (*Lindenstadt*, *supra*, 55 Cal.App.4th at pp. 888-889.) "[A]ny preliminary determination of legality by the arbitrator, whether in the nature of a determination of a pure question of law or a

12

mixed question of fact and law, should not be held to be binding upon the trial court."
(*Loving*, *supra*, 33 Cal.2d at p. 609.)

Sheppard Mullin, arguing that limited judicial review applies, relies on *Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1 (*Moncharsh*) and *Ahdout v. Hekmatjah* (2013) 213 Cal.App.4th 21, 33 (*Ahdout*). These cases are not controlling, however, because they address judicial review when a party has alleged that only a portion of an otherwise enforceable contract—rather than the contract as a whole—is illegal or unenforceable.

The Supreme Court explored this distinction in *Loving*, *supra*, 33 Cal.2d 603. In that case, the Court held it was error to confirm an arbitration award in favor of unlicensed contractors. The Court stated that "ordinarily with respect to arbitration proceedings 'the merits of the controversy between the parties are not subject to judicial review,' [citations]. But . . . the rules which give finality to the arbitrator's determination of ordinary questions of fact or of law are inapplicable where the issue of illegality of the entire transaction is raised in a proceeding for the enforcement of the arbitrator's award." (*Id*. at p. 609.) The Court went on to say that deference to the findings of the arbitrators was not warranted in such circumstances: "When so raised, the issue [of illegality] is one for judicial determination upon the evidence presented to the trial court, and any preliminary determination of legality by the arbitrator, whether in the nature of a determination of a pure question of law or a mixed question of fact and law, should not be held to be binding upon the trial court." (*Ibid*.; see also *All Points Traders, Inc. v. Barrington Associates* (1989) 211 Cal.App.3d 723, 737.)

The Supreme Court again emphasized this distinction in *Moncharsh*, which involved a challenge to only the fee-splitting clause of the relevant agreement, rather than the entire agreement. (*Moncharsh*, *supra*, 3 Cal.4th at p. 32 ["Moncharsh challenges but a single provision of the overall employment contract"].) Since only a claim of *partial* illegality was raised, the Court ruled that the issue of illegality was for the arbitrator to resolve. (*Id*. at p. 30.) Indeed, the *Moncharsh* Court said that if the parties had established that the entire contract was illegal, the arbitration clause would not be enforceable: "[I]f an otherwise enforceable arbitration agreement is contained in an

13

illegal contract, a party may avoid arbitration altogether." (*Id.* at 29; see also *Richey v. AutoNation, Inc*. (2015) 60 Cal.4th 909, 917 ["*Moncharsh* noted that judicial review may be warranted when a party claims that an arbitrator has enforced an entire contract or transaction that is illegal."].)

*Lindenstadt*, *supra*, 55 Cal.App.4th 882 also held that the trial court, not the arbitrator, must determine the legality of an entire contract. There, the court recognized the general rule that courts should not interfere with arbitration awards, but noted that in *Loving* "the Supreme Court recognized a narrow exception to the general rule" when a party challenged the legality of the entire contract. (*Lindenstadt*, *supra*, 55 Cal.App.4th at p. 889.) In that case, plaintiff Lindenstadt assisted defendant Staff Builders in locating home health care businesses to acquire. Lindenstadt brought an action against Staff Builders seeking finder's fees for locating several businesses; Staff Builders asserted that Lindenstadt was statutorily barred from seeking fees because he acted as an unlicensed real estate broker. (*Id.* at pp. 885-886.) The case went to arbitration based on the parties' contract, and the arbitrator concluded Lindenstadt was entitled to fees. (*Id.* p. 887.) In its opposition to Lindenstadt's motion to confirm the arbitration award, Staff Builders argued that the trial court was obligated to undertake a de novo review of the evidence to determine whether the arbitration award was based on illegal contracts or transactions. (*Id.* p. 888.) The Court of Appeal agreed, saying that Lindenstadt "'cannot be permitted to rely upon the arbitrator's conclusion of legality' ([*Loving*, *supra*, 33 Cal.2d] at p. 614) since '. . . it would violate public policy to allow a party to do through arbitration what it cannot do through litigation' (*Ericksen, Arbuthnot, McCarthy, Kearney & Walsh, Inc. v. 100 Oak Street* (1983) 35 Cal.3d 312, 316, fn. 2, [*Ericksen*])." (*Lindenstadt*, *supra*, 55 Cal.App.4th at pp. 892-893.) The Court of Appeal remanded the case to allow the trial court to determine whether Lindenstadt acted as an unlicensed real estate broker in each transaction at issue.

*Ahdout*, *supra*, 213 Cal.App.4th 21, also discussed the different standards of review of an arbitration award depending on whether a party challenges an entire contract, or only a portion of a contract, as illegal or unenforceable. *Ahdout* contrasted

14

*Loving*, where the entire agreement was challenged, with *Moncharsh*, where only a portion of the contract was challenged: "Whereas the building contract in *Loving* was rendered void in its entirety by the contractor's lack of a license, the illegality alleged in *Moncharsh* affected only one provision of an employment contract. . . ." (*Ahdout*, *supra*, at p. 36.) *Ahdout* recognized that the enforceability of the entire contract was also challenged in *Lindenstadt*, and added, "Indeed, the court in *Lindenstadt* noted the language in *Moncharsh* limiting the scope of *Loving* to cases where the entire contract or transaction was illegal." (*Ibid.*) By comparison, *Ahdout* noted that "the alleged illegality in the instant case does not infect the entire contract." (*Ibid.*) As a result, *Ahdout* found, review of the arbitrator's decision on the narrow grounds articulated in section 1286.2 was appropriate in that case, and "the exception enunciated in *Loving* and *Lindenstadt*, as considered by *Moncharsh*, is not applicable." (*Ibid.*) Here, judicial determination is required because, as in *Loving* and *Lindenstadt*, J-M has challenged the legality of the contract as a whole.[4]

J-M argued that the entire Agreement was unenforceable because Sheppard Mullin had a conflict of interest when it simultaneously represented J-M in the Qui Tam Action and adverse party South Tahoe in other matters. As stated in *Loving*, *Moncharsh*, *Lindenstadt*, and *Ahdout*, a challenge to the enforceability of a contract as a whole, rather

---

[4] Sheppard Mullin also argues that the public policy supporting arbitration compels us to affirm the arbitration award. We recognize the "strong public policy in favor of arbitration as a speedy and relatively inexpensive means of dispute resolution." (*Ericksen*, *supra*, 35 Cal.3d at p. 322.) But the public policy supporting arbitration does not take precedence over the mandate that contracts comply with California's other public policies. "The laws in support of a general public policy and in enforcement of public morality cannot be set aside by arbitration, and neither will persons with a claim forbidden by the laws be permitted to enforce it through the transforming process of arbitration." (*Loving*, *supra*, 33 Cal.2d at p. 611, quoting *Tandy v. Elmore-Cooper Live Stock Commission Co.* (Mo. App. 1905) 87 S.W. 614, 618; see also *Moncharsh*, *supra*, 3 Cal.4th at p. 32 [allowing judicial scrutiny of an arbitral award when a court is presented with "a clear expression of illegality or public policy undermining this strong presumption in favor of private arbitration"].) The public policy supporting arbitration therefore does not limit the scope of judicial review of an allegedly unenforceable contract.

than a portion of an otherwise enforceable contract, must be decided by the court rather than the arbitrator.[5] The trial court therefore erred by deferring to the arbitrators in determining the enforceability of the Agreement.

### C.     Sheppard Mullin violated Rule 3-310

Turning to the substance of the case, we determine whether Sheppard Mullin's simultaneous representation of J-M and South Tahoe violated Rule 3-310 of the California Rules of Professional Conduct. As noted above, we consider this question de novo.

Rule 3-310(C)(3) provides that an attorney "shall not, *without the informed written consent of each client . . .* [r]epresent a client in a matter and at the same time in a separate matter accept as a client a person or entity whose interest in the first matter is adverse to the client in the first matter." (Italics added.) "'Informed written consent' means the client's . . . written agreement to the representation following written disclosure." (Rule 3-310(A)(2).)

J-M argues that the Agreement violated "the fundamental public policy embodied in rule 3-310(C) of the Rules of Professional Conduct, which required J-M's informed written consent to any conflicting representation by Sheppard." Sheppard Mullin, on the

---

[5] The trial court erred by characterizing J-M's illegality argument as an assertion based only on fraudulent inducement to be determined by the arbitrators: "Defendant has attempted to characterize this case as one based upon illegality, rather than fraudulent inducement. The Court is not convinced of this distinction . . . ." Indeed, there is a distinction. The Supreme Court has held that under California law, "claims of fraud in the inducement of the contract (as distinguished from claims of fraud directed to the arbitration clause itself) will be deemed subject to arbitration." (*Ericksen, supra,* 35 Cal.3d at p. 323.) But in so holding, the court was careful to distinguish cases in which a defendant alleges the contract was illegal or in violation of public policy. "Questions of public policy which are implicated by an illegal agreement, and which might be ill-suited for arbitral determination, are not presented when garden-variety 'fraud in the inducement,' related to performance failure, is claimed." (*Id.* at p. 316, fn. 2.) Here, although J-M did assert garden-variety fraudulent inducement, it also placed the illegality question squarely before the court. The trial court therefore erred in holding that J-M's illegality argument implicated *only* fraud in the inducement to be determined by the arbitrators.

other hand, argues that the "Engagement Agreement's conflict waiver was plainly legal." "Whether a contract is illegal or contrary to public policy is a question of law to be determined from the circumstances of each particular case." (*Jackson v. Rogers & Wells* (1989) 210 Cal.App.3d 336, 349-350; see also *Brisbane Lodging, L.P. v. Webcor Builders, Inc*. (2013) 216 Cal.App.4th 1249, 1256-1257; *Bovard v. American Horse Enterprises, Inc*. (1988) 201 Cal.App.3d 832, 838.)

Sheppard Mullin argues that J-M's "illegality argument rests entirely on disputed factual issues that are not reviewable." Sheppard Mullin cites *Loving* to argue that illegality must be proved by "uncontradicted evidence." (See *Loving*, *supra*, 33 Cal.2d at p. 610 [if "it appears to the court from the uncontradicted evidence that the contract is illegal," the court should deny a petition to compel arbitration or enforce an arbitration award].) Courts have rejected this interpretation of *Loving*. "[A] reading of *Loving & Evans* to require uncontradicted evidence of illegality is too formalistic. The court did not explicitly condition its holding on the existence of uncontroverted evidence. Rather, the case merely stands for the proposition that the legality of the underlying agreement should first be judicially determined." (*Green v. Mt. Diablo Hospital Dist*. (1989) 207 Cal.App.3d 63, 74.)

Nonetheless, the essential facts are not in dispute. Sheppard Mullin partner Jeffery Dinkin did work for South Tahoe before the parties entered into the Agreement. Sheppard Mullin's conflicts check revealed Dinkin's work for South Tahoe before Sheppard Mullin gave the Agreement to J-M, but Sheppard Mullin concluded that there was no reason to disclose this relationship to J-M. J-M signed the Agreement without knowing that Sheppard Mullin represented South Tahoe in unrelated matters. The parties disagree about whether South Tahoe was a "former" client or a "current" client at the time the Agreement was signed. However, it is undisputed that three weeks after J-M signed the Agreement, Dinkin began working for South Tahoe again, so there is no question that there was an actual conflict at that point. Sheppard Mullin was disqualified from the Qui Tam Action as a result.

17

Sheppard Mullin argues that it proceeded as required by Rule 3-310(C)(3): "The conflict waiver in the Engagement Agreement waives both current *and* future conflicts. Waivers of current and future conflicts are commonplace and enforced by California and other courts." The conflict waiver provision in the Agreement stated that Sheppard Mullin "may currently or in the future represent one or more other clients (including current, former, and future clients) in matters involving [J-M]." The Agreement allowed Sheppard Mullin to engage in conflicting representations "*provided* the other matter is not substantially related to our representation of [J-M] and in the course of representing [J-M] we have not obtained confidential information of [J-M] material to representation of the other client." It continued, "By consenting to this arrangement, [J-M] is waiving our obligation of loyalty to it so long as we maintain confidentiality and adhere to the foregoing limitations."

What Sheppard Mullin ignores, however, is that Rule 3-310(C)(3) requires *informed* written consent. "Where . . . a fully informed consent is not obtained, the duty of loyalty to different clients renders it impossible for an attorney, consistent with ethics and the fidelity owed to clients, to advise one client as to a disputed claim against the other." (*Klemm v. Superior Court* (1977) 75 Cal.App.3d 893, 898.)

Here, the undisputed facts demonstrate that Sheppard Mullin did not disclose *any* information to J-M about a conflict with South Tahoe. The Agreement includes a boilerplate waiver that included no information about any specific potential or actual conflicts. Dinkin was working for South Tahoe while Sheppard Mullin was defending J-M against South Tahoe in the Qui Tam Action. It strains credulity to suggest that the Agreement constituted "*informed* written consent" of actual conflicts to J-M, when in fact Sheppard Mullin was silent about any conflict.

Even assuming Sheppard Mullin was not representing South Tahoe at the time it entered into the agreement with J-M, Sheppard Mullin nonetheless began performing additional work for South Tahoe three weeks later. It did not inform either client of this actual conflict. Because "waiver must be informed, a second waiver may be required if the original waiver insufficiently disclosed the nature of a subsequent conflict." (*Concat*

18

*LP v. Unilever, PLC* (N.D. Cal. 2004) 350 F.Supp.2d 796, 820 (*Concat*), citing *Visa U.S.A. Inc. v. First Data Corp.* (N.D. Cal. 2003) 241 F.Supp.2d 1100, 1106 (*Visa*); see also Rule 3-310(C)(3) [an attorney may not "accept" new representation creating an actual conflict with an existing client without obtaining informed, written consent]; *Western Sugar Coop. v. Archer-Daniels-Midland Co.* (C.D. Cal. 2015) 98 F.Supp.3d 1074, 1082 (*Western Sugar*).)

In asserting its position that the waiver in the Agreement was sufficient, Sheppard Mullin relies on *Zador Corp. v. Kwan* (1995) 31 Cal.App.4th 1285 (*Zador*) and *Visa*, *supra*, 241 F.Supp.2d 1100 to argue that its broadly worded future waiver was sufficient. These cases, however, demonstrate the appropriate steps an attorney should take to obtain a client's informed written consent to a conflict pursuant to Rule 3-310—and thus highlight Sheppard Mullin's failure to do so.

*Zador*, *supra*, 31 Cal.App.4th 1285 addressed informed waivers of potential future conflicts. In that case, Zador Corporation purchased a parcel of property through its agent, C. K. Kwan. A subsequent conveyance of the property gave rise to a claim by another party that he was entitled to an interest in the property, and he sued Zador, Kwan, and another entity. Zador asked the law firm Heller, Ehrman, White & McAuliffe (Heller), which had represented Zador's ownership for ten years, to handle the lawsuit.

Kwan asked Heller to represent him as well. Heller made clear to Kwan that it was also representing Zador, and presented Kwan with an agreement waiving and consenting to potential conflicts of interest. The agreement explained that while there was no present, actual conflict between Zador and Kwan, actual conflicts could arise if the interests of Zador became inconsistent with Kwan's interests. The agreement explained possible risks if an actual conflict arose, including "shared attorney-client loyalties" and possible erosion of attorney-client privilege, and stated that Heller would continue to represent Zador if its interests became adverse to Kwan. The agreement encouraged Kwan to seek independent counsel regarding the "import of this consent" and asked him to agree not to seek disqualification of Heller if an actual conflict arose.

19

(*Zador, supra*, 31 Cal.App.4th at pp. 1289-1290.) Kwan took twenty minutes to study the agreement and then signed it. (*Id.* at p. 1290.)

Two months later, Heller learned of a possible conflict between Kwan and Zador. Heller informed Kwan of the possible conflict and recommended he retain independent counsel. Kwan reaffirmed his consent to Heller's continued representation of Zador. In a confirming letter to Kwan, Heller memorialized this consent. Eventually, however, Zador (through Heller) named Kwan as a cross-defendant. (*Zador, supra*, 31 Cal.App.4th at pp. 1291-1292.) Kwan then moved to disqualify Heller and the trial court granted the motion. (*Id*. at p. 1292.)

The Court of Appeal held that disqualification of Heller was not required because Kwan had provided informed consent to Heller's continued representation of Zador in the event of a conflict. (*Zador*, *supra*, 31 Cal.App.4th at p. 1295.) The court noted with approval that "The waiver and consent form was detailed." (*Id*. at p. 1299, repeated at p. 1301.) The court pointed out that when adversity arose between Kwan and Zador, Kwan obtained separate legal counsel but initially "reaffirmed his agreement to the consent form and to Heller's continued representation of Zador." (*Id*. at p. 1301.) The order disqualifying Heller was therefore reversed. (*Id*. at p. 1303.)

The second case Sheppard Mullin cites, *Visa*, *supra*, 241 F.Supp.2d 1100, also involved a motion to disqualify Heller in a case involving a potential future conflict. First Data, which was developing a system to processes credit card transactions, asked Heller to represent it in a patent infringement action pending in Delaware. The parties recognized a possible future conflict with Visa, with whom Heller had a longstanding relationship. Heller informed First Data that although it saw no current conflict in representing First Data in the Delaware action, it would only agree to represent First Data if First Data agreed to permit Heller to represent Visa in any future disputes, including litigation, that might arise between First Data and Visa. First Data agreed, and signed an engagement letter that clearly stated these terms. (*Visa,* at p. 1102.)

About a year later, Visa sued First Data in California for trademark infringement and other claims. First Data moved to disqualify Heller as counsel for Visa in the

California case, arguing that Heller's violation of Rule 3-310(C) required automatic disqualification. (*Visa, supra*, 241 F.Supp.2d at p. 1104.)

The district court observed that an advance waiver of potential future conflicts, such as the one executed by First Data and Heller, is permitted under California law, even if the waiver does not specifically state the exact nature of the future conflict. (*Visa, supra*, 241 F.Supp.2d at p. 1105.) Citing *Zador*, the *Visa* court emphasized that the "only inquiry that need be made is whether the waiver was fully informed," and noted that "[a] second waiver by First Data in a non-related litigation would only be required if the waiver letter insufficiently disclosed the nature of the conflict that subsequently arose between Visa and First Data." (*Id.* at p. 1106.)

Citing *People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.* (1999) 20 Cal.4th 1135, 1145 (*SpeeDee Oil*), *Zador, supra*, 31 Cal.App.4th 1285, and other authority, the *Visa* court identified factors to be taken into account in evaluating whether full disclosure was made and the client made an informed waiver, such as the breadth of the waiver, the temporal scope of the waiver, the quality of the conflicts discussion between the attorney and the client, and the nature of the actual conflict. (*Visa, supra*, 241 F.Supp.2d at p. 1106.) Applying these factors, the *Visa* court found that the waiver was sufficient because Heller had identified the adverse client and disclosed as fully as possible the nature of any potential conflict. Heller had also explained that in the event of an actual conflict, it would represent Visa in any matters against First Data, including litigation. (*Id.* at p. 1107.) The court found that First Data signed the waiver with fully informed consent to any conflict with Visa. (*Id.* at pp. 1108-1109.)

*Zador* and *Visa* stand in sharp contrast to the facts here. Unlike Heller in *Zador* and *Visa*, Sheppard Mullin did not disclose the circumstances regarding a potential or actual conflict with South Tahoe to either J-M or South Tahoe. The Sheppard Mullin attorneys on the Qui Tam Action were aware the firm had a relationship with South Tahoe, and even sought advice from firm counsel as to whether it had to be disclosed before J-M signed the Agreement. The conflict waiver provision in the Agreement did not mention South Tahoe. Instead, it broadly waived all current and future conflicts with

21

any client: "<u>Conflicts with Other Clients</u>. Sheppard, Mullin Richter & Hampton LLP has many attorneys and multiple offices. We may currently or in the future represent one or more other clients (including current, former, and future clients) in matters involving [J-M]. . . . By consenting to this arrangement, [J-M] is waiving our obligation of loyalty to it so long as we maintain confidentiality and adhere to the foregoing limitations."

The facts here therefore are not analogous to *Zador* and *Visa*, because Sheppard Mullin (1) failed to inform J-M about any potential or actual conflict with South Tahoe, and (2) did not obtain J-M's informed, written consent to continued representation despite the actual conflict that occurred while Sheppard Mullin was working for J-M and South Tahoe at the same time. Written consent to all potential and actual conflicts in the absence of any knowledge about the existence of such conflicts cannot comply with the requirement of "informed written consent" in Rule 3-310(C). Because Sheppard Mullin failed to secure informed written consent to the conflict before or during its representation of J-M, the Agreement violated Rule 3-310.[6]

**D.      Rule 3-310 is an expression of public policy central to the attorney-client relationship, the violation of which warrants finding the Agreement unenforceable**

Having found that Sheppard Mullin violated Rule 3-310, the next question is whether the violation renders the parties' Agreement unenforceable. We find that it does.

A contract must have a lawful object or the contract is void. (Civ. Code, §§ 1550, subd. (3), 1596, 1598.) An unlawful contract is not valid. (Civ. Code, §§ 1607, 1667.)

---

[6] Sheppard Mullin argues that finding the conflict waiver provision inadequate would "upend countless agreements between lawyers and their clients and wreak havoc on the practice of law in this State." We disagree. We would not be the first court to reject an uninformed, blanket advance waiver such as the one at issue in this case. (See, e.g., *Concat*, *supra*, 350 F.Supp.2d at pp. 801, 821; *Lennar Mare Island, LLC v. Steadfast Ins. Co.* (E.D. Cal. 2015) 105 F.Supp.3d 1100, 1115; *Western Sugar*, *supra*, 98 F.Supp.3d at p. 1083.) Moreover, our holding is consistent with the purpose of the Rules of Professional Conduct—to "protect the public and to promote respect and confidence in the legal profession." (Rule 1-100(A).)

22

A contract is unlawful if it is "1. Contrary to an express provision of law; 2. Contrary to the policy of express law, though not expressly prohibited; or, 3. Otherwise contrary to good morals." (Civ. Code, § 1667; see also Civ. Code, §§ 1441 ["A condition in a contract, the fulfillment of which is . . . unlawful . . . is void"], 1608 ["If any part of a single consideration for one or more objects, or of several considerations for a single object, is unlawful, the entire contract is void"].) Therefore, courts have long held that "[a] contract made contrary to public policy or against the express mandate of a statute may not serve as the foundation of any action, either in law or in equity [citation], and the parties will be left, therefore, where they are found when they come to a court for relief." (*Tiedje v. Aluminum Taper Milling Co*. (1956) 46 Cal.2d 450, 453-454; see also *Kashani v. Tsann Kuen China Enterprise Co., Ltd*. (2004) 118 Cal.App.4th 531, 541.)

At issue in this case are the public policies embodied in the California Rules of Professional Conduct, which "are not only ethical standards to guide the conduct of members of the bar; but they also serve as an expression of public policy to protect the public." (*Altschul v. Sayble* (1978) 83 Cal.App.3d 153, 163 (*Altschul*).) "The effective functioning of the fiduciary relationship between attorney and client depends on the client's trust and confidence in counsel. (*Flatt [v. Superior Court* (1994) 9 Cal.4th 275,] 282, 285 [*Flatt*].) The courts will protect clients' legitimate expectations of loyalty to preserve this essential basis for trust and security in the attorney-client relationship. (*Ibid*.)" (*SpeeDee Oil*, *supra*, 20 Cal.4th at pp. 1146-1147.) Sheppard Mullin breached this essential basis for trust and security as to both J-M and South Tahoe.

A contract in violation of Rule 3-310(C) is against the public interest. "Rule 3-310 and conflict of interest rules are designed to 'assure the attorney's absolute and *undivided loyalty* and commitment to the client and the *protection of client confidences*.' (1 Vapnek et al., Cal. Practice Guide: Professional Responsibility (The Rutter Group 2007 ¶ 4:4, p. 4–3.)" (*Sharp v. Next Entertainment, Inc*. (2008) 163 Cal.App.4th 410, 427.) "It is well established that an attorney's duties to his client are governed by the Rules of Professional Conduct, and that those rules, together with statutes and general principles relating to other fiduciary relationships, 'help define the duty component of the

23

fiduciary duty which an attorney owes his client.' [Citation.]" (*American Airlines v. Sheppard Mullin*, *supra*, 96 Cal.App.4th at p. 1032.)

"The primary value at stake in cases of simultaneous or dual representation is the attorney's duty—and the client's legitimate expectation—of loyalty, rather than confidentiality." (*Flatt*, *supra*, 9 Cal.4th at p. 284.) The Supreme Court explained the underlying public policy: "A client who learns that his or her lawyer is also representing a litigation adversary, even with respect to a matter wholly unrelated to the one for which counsel was retained, cannot long be expected to sustain the level of confidence and trust in counsel that is one of the foundations of the professional relationship." (*Id*. at p. 285.) Thus, "[t]he courts will protect clients' legitimate expectations of loyalty to preserve this essential basis for trust and security in the attorney-client relationship. (*Ibid.*)" (*SpeeDee Oil, supra*, 20 Cal.4th at pp. 1146-1147.) "'The paramount concern . . . [is] to preserve public trust in the scrupulous administration of justice and the integrity of the bar.'" (*Fiduciary Trust International of California v. Superior Court* (2013) 218 Cal.App.4th 465, 485-486 (*Fiduciary Trust*), quoting *SpeeDee Oil*, *supra*, 20 Cal.4th at p. 1145.)

At oral argument, Sheppard Mullin cited *Ahdout* to argue that courts may consider only public policy as expressly declared by the Legislature. As a result, Sheppard Mullin argued, the Rules of Professional Conduct—adopted by the Board of Governors of the State Bar of California and approved by the Supreme Court of California (Rule 1-100)—do not represent a statement of California public policy sufficient to render a contract unenforceable. (See *Ahdout*, *supra*, 213 Cal.App.4th at pp. 38-39 ["The fact that [Bus. & Prof. Code] section 7031 reflects an explicit expression by the *Legislature* of its public policy objectives sets this case apart from *Moncharsh*, which concerned alleged violations of the Rules of Professional Conduct that are approved by the Supreme Court, not the Legislature."].) This is an incorrect reading of *Ahdout*, which distinguished cases such as *Moncharsh* that discuss the Rules of Professional Conduct but did not hold that such rules cannot serve as a valid expression of public policy.

Instead, "[t]here is no requirement that a contract violate an express mandate of a statute before it may be declared void as contrary to public policy." (*Altschul*, *supra*, 83

24

Cal.App.3d at p. 162; see also *Margolin v. Shemaria* (2000) 85 Cal.App.4th 891, 901 ["Both legislative enactments and administrative regulations can be utilized to further this state's public policy of protecting consumers in the marketplace of goods and services."].) When determining whether a contract is unenforceable because it violates public policy, courts may look to a variety of sources. "The public policy in question may sometimes be based on statute (see, e.g., *Wildman v. Government Employees' Ins. Co.* (1957) 48 Cal.2d 31 [ ]) but does not necessarily have to be—it can be based on other policies perceived to be contrary to the public welfare. (See *Altschul*[, *supra*,] 83 Cal.App.3d 153, 162 [court refuses to enforce fee-for-referral agreements among attorneys as contrary to public policy].)" (*Rosen v. State Farm General Ins. Co.* (2003) 30 Cal.4th 1070, 1081, Moreno, J., concurring; see also *Cariveau v. Halferty* (2000) 83 Cal.App.4th 126, 132 ["Public policy, in the context of a court's refusal to enforce a contract term, may be based on the policy expressed in a statute or the rules of a voluntary regulatory entity, or may be implied from the language of such statute or rule."].) Thus, in the context of determining whether a contract as a whole is illegal or against public policy and therefore unenforceable, a determination of relevant public policy is not limited to an explicit expression of public policy by the Legislature.

Moreover, Sheppard Mullin's argument ignores the long line of cases relying on the Rules of Professional Conduct to find contracts unenforceable. (See, e.g., *Chambers v. Kay* (2002) 29 Cal.4th 142, 161 ["[B]ecause this court approved rule 2–200 under legislative authorization (see Bus. & Prof.Code, § 6076), and because the rule binds all members of the State Bar (rule 1–100(A), 1st par.), it would be absurd for this or any other court to aid Chambers in accomplishing a fee division that would violate the rule's explicit requirement of written client consent and would subject Chambers to professional discipline."]; *Cotchett, Pitre & McCarthy v. Universal Paragon Corp.* (2010) 187 Cal.App.4th 1405, 1417 ["Fee agreements that violate the Rules of Professional Conduct may be deemed unenforceable on public policy grounds."]; *Bird, Marella, Boxer & Wolpert v. Superior Court* (2003) 106 Cal.App.4th 419, 431 [A fee agreement that violates Rule 4-200 is not valid and enforceable]; *McIntosh v. Mills*

25

(2004) 121 Cal.App.4th 333, 346 ["In light of these public interest concerns, and because there is no dispute here that the agreement at issue between McIntosh and Mills clearly violates CPRC, rule 1–320(A), we conclude that the doctrine of illegality applies facially to their fee-sharing agreement."]

As discussed in *Flatt*, *SpeeDee Oil*, *American Airlines v. Sheppard Mullin*, and *Fiduciary Trust*, the attorney's duty of undivided loyalty that forms the basis of Rule 3-310 constitutes the very foundation of an attorney-client relationship. The Agreement, which violated Rule 3-310(C), therefore violated an expression of public policy. The trial court erred in holding that the Agreement was valid and enforceable.

### E. As a result of Sheppard Mullin's violation of 3-310, it is not entitled to attorney fees

Sheppard Mullin argues that despite its violation of Rule 3-310, it is nonetheless entitled to its attorney fees for its representation of J-M in the Qui Tam Action. However, when a conflict of interest is asserted as a "[d]efense in the attorney's action to recover fees or the reasonable value of services[, a] violation of the fiduciary obligation will defeat recovery." (1 Witkin, Cal. Proc. 5th (2008) Attys, § 104, p. 142.) Sheppard Mullin's violation of Rule 3-310 precludes it from receiving compensation for services provided to J-M in the Qui Tam Action.

"A lawyer engaging in clear and serious violation of duty to a client may be required to forfeit some or all of the lawyer's compensation for the matter. Considerations relevant to the question of forfeiture include the gravity and timing of the violation, its willfulness, its effect on the value of the lawyer's work for the client, any other threatened or actual harm to the client, and the adequacy of other remedies." (Rest.3d of the Law Governing Lawyers, § 37.)

California cases have drawn a line between cases involving serious ethical violations such as conflicts of interest, in which compensation is prohibited, and technical violations or potential conflicts, in which compensation may be allowed. Two seminal cases set out the governing principles. The first is *Goldstein v. Lees* (1975) 46 Cal.App.3d 614 (*Goldstein*), a case in which a law firm sought to recover fees for legal

26

services rendered.  In the underlying case, a former corporate counsel represented a minority shareholder and director in a proxy fight against the same corporation.  Focusing on the fact that the attorney knew confidential information about the corporation, the Court of Appeal held that former Rule 5 barred recovery of attorney fees for the underlying action.[7]  (*Id*. at pp. 620, 623-624.)  The court reasoned, "It is settled in California that an attorney may not recover for services rendered if those services are rendered in contradiction to the requirements of professional responsibility."  (*Id*. at p. 618, citing *Clark v. Millsap* (1926) 197 Cal. 765, 785 ["acts of impropriety inconsistent with the character of the profession, and incompatible with the faithful discharge of its duties" will prevent an attorney from recovering for services rendered.].)

The second seminal case is *Jeffry v. Pounds* (1977) 67 Cal.App.3d 6 (*Jeffry*).  In that case, a law firm represented a husband in a personal injury action, but also agreed to represent his wife in a dissolution of marriage action she brought against him.  The Court of Appeal found that the law firm had breached former Rule 5-102(B),[8] which precluded an attorney from representing conflicting interests unless all parties concerned provided informed written consent.  The attorney did not obtain written consent of both parties.  (*Id*. at p. 11.)  The *Jeffry* court denied any fees to the firm for work performed after the conflict arose.  (*Id*. at p. 12.)  The court emphasized that this conclusion was not based on an improper intent on the part of the firm:  "We do not charge [the firm] with dishonest purpose or deliberately unethical conduct."  (*Id*. at p. 11.)

---

[7] At the time, Rule 5 stated, "'A member of the State Bar shall not accept employment adverse to a client or former client, . . . relating to a matter in reference to which he has obtained confidential information by reason of or in the course of his employment by such client or former client.'"  (*Goldstein*, *supra*, 46 Cal.App.3d at pp. 618-619.)

[8] Former Rule 5-102(B) (duty of loyalty) is a predecessor to current Rule 3-310, as is former Rule 4-101 (requiring counsel to preserve the confidentiality of client matters).  "The former rules governing attorneys' duties of confidentiality and loyalty were thus consolidated into a single rule."  (*Flatt*, *supra*, 9 Cal.4th at p. 288, fn. 5.)

A number of cases have followed *Goldstein* and *Jeffry*. (See, e.g., *Cal Pak Delivery, Inc. v. United Parcel Service, Inc.* (1997) 52 Cal.App.4th 1, 16 [attorney not entitled to fees after he offered to dismiss a class action in return for a personal payment to him of millions of dollars]; *A.I. Credit Corp., Inc. v. Aguilar & Sebastinelli* (2003) 113 Cal.App.4th 1072 [law firm not entitled to fees after it helped a new client enforce a judgment against a former client by assisting the new client in locating and pursuing the former client's assets].) Another case, *Fair v. Bakhtiari* (2011) 195 Cal.App.4th 1135 (*Fair*), noted that attorneys are not entitled to fees where the ethical violation is "one that pervades the whole relationship." (*Id.* at p. 1150.) *Fair* affirmed the trial court's denial of quantum meruit recovery where an attorney's conduct "constituted not merely a technical rule violation, but the breach of Fair's fiduciary duty to" his clients. (*Id.* at p. 1151.)

As in *Fair*, the conflict here pervaded the entire relationship between Sheppard Mullin and J-M. Even if, as Sheppard Mullin argues, it was not working for South Tahoe at the time the Agreement was signed, it nonetheless began working for South Tahoe three weeks later, thereby representing adverse clients without telling either client about the actual conflict. The violation caused Sheppard Mullin to be disqualified from representing J-M in the Qui Tam Action—the very purpose for which J-M had hired it. It is clear, therefore, that Sheppard Mullin's ethical breach went to the very heart of its relationship with J-M.

Sheppard Mullin cites *Mardirossian & Associates v. Ersoff* (2007) 153 Cal.App.4th 257, *Slovensky v. Friedman* (2006) 142 Cal.App.4th 1518, and *Sullivan v. Dorsa* (2005) 128 Cal.App.4th 947 to argue that "courts routinely award attorneys their fees despite conflicts of interest that could lead to disqualification." These cases are distinguishable in that none of them involved an actual conflict.

Sheppard Mullin also argues that fees should be allowed because J-M suffered no damage as the result of its ethical violations and because the arbitrators found it acted in good faith. Given Sheppard Mullin's ethical misconduct here, it is irrelevant whether J-M suffered damage. "It is the general rule in conflict of interest cases that where an

28

attorney violates his . . . ethical duties to the client, the attorney is not entitled to a fee for his . . . services. [Citations.]" (*Cal Pak, supra*, 52 Cal.App.4th at p.14.) We note that the *Fair* court rejected a similar argument regarding lack of damage: "No authority cited by Fair holds that proof the client was damaged by the attorney's breach of fiduciary duty or conflict of interest is required to void the agreement between the two . . . where the breach is sufficiently serious." (*Fair, supra*, 195 Cal.App.4th at pp. 1153-1154.) Moreover, forfeiture of attorney fees is intended to be a deterrent, which is invoked because the "damage that misconduct causes is often difficult to assess." (Restatement (Third) of the Law Governing Lawyers § 37 (2000).) J-M's actual damages as result of Sheppard Mullin's breach are irrelevant.

The analysis does not change because Sheppard Mullin has alleged that it is entitled to fees under a quantum meruit theory. In *Huskinson & Brown v. Wolf* (2004) 32 Cal.4th 453 (*Huskinson*), the Supreme Court acknowledged that quantum meruit recovery had been denied in cases of ethical violations such as Sheppard Mullin's here. It observed that such cases "involved violations of a rule that proscribed the very conduct for which compensation was sought, i.e., *the rule prohibiting attorneys from engaging in conflicting representation or accepting professional employment adverse to the interests of a client or former client without the written consent of both parties*." (*Huskinson*, 32 Cal.4th at p. 463, italics added, citing *Jeffry*, *supra*, 67 Cal.App.3d 6, 12 and *Goldstein*, *supra*, 46 Cal.App.3d 614.) The same result was reached in *Fair*, in which the Court of Appeal concluded that Fair's breach of fiduciary duty precluded recovery of fees in quantum meruit: "[V]iolation of a rule that constitutes a serious breach of fiduciary duty, such as a conflict of interest that goes to the heart of the attorney-client relationship, warrants denial of quantum meruit recovery. [Citations.]" (*Fair*, *supra*, 195 Cal.App.4th at pp. 1161-1162.)

We have found that Sheppard Mullin's breach of the duty of loyalty set forth in Rule 3-310 was a violation of public policy. A finding that Sheppard Mullin was nonetheless entitled to its attorney fees as if no breach had occurred would undermine this same public policy. We therefore follow the reasoning of *Goldstein* and *Jeffry* and

29

hold that Sheppard Mullin is not entitled to its fees for the work it did for J-M while there was an actual conflict with South Tahoe.

### F. Disputed fact issue about when the actual conflict began

There is no question that starting from March 29, 2010, the date Dinkin resumed work on behalf of South Tahoe while other Sheppard Mullin attorneys were representing J-M in the Qui Tam Action, there was an actual conflict in violation of Rule 3-310(C). At that point Sheppard Mullin "in a separate matter accept[ed] as a client a person or entity [South Tahoe] whose interest in the first matter [the Qui Tam Action] is adverse to the client in the first matter [J-M]." (Rule 3-310(C)(3).) Sheppard Mullin admits that in late March 2010 South Tahoe "reemerged" as a client, and Dinkin stated in his declaration that he worked for South Tahoe in March, April, June, October, and December 2010, and in January, February, and March of 2011.

There is a fact question, however, as to whether there was an actual conflict between the time J-M signed the Agreement (March 8, 2010) and when Dinkin resumed actively working for South Tahoe (March 29, 2010). Sheppard Mullin argues that South Tahoe was not a current client when the Agreement with J-M was signed because Dinkin had not done any work for South Tahoe for five months before that. J-M argues that an actual conflict nonetheless existed because Sheppard Mullin had an ongoing relationship with South Tahoe for many years. Indeed, Dinkin stated in his declaration that he brought South Tahoe with him as a client when he joined Sheppard Mullin in 2002. Also, in a June 9, 2011 letter to South Tahoe after the conflict came to light, Sheppard Mullin stated, "We have been pleased to provide labor advice to you for the last 9 years."

Sheppard Mullin and South Tahoe executed engagement agreements in 2002 and 2006. The 2006 engagement agreement states, "Termination of Representation. You [South Tahoe] have the right to terminate our representation of you at any time. Subject to our ethical obligation to give you reasonable notice to arrange for alternative representation, we may terminate our representation of you at any time. Unless we agree to render other legal services to the District, our representation will terminate upon completion of the Matter." "Matter" is defined elsewhere in the contract as "general

30

employment matters." The record reveals no engagement agreements with South Tahoe post-dating this 2006 agreement. Dinkin stated in his declaration that he "occasionally handled discrete individual matters and provided advice to South Tahoe" through November 2009 based on the 2002 and 2006 agreements. Therefore, it is unclear whether Sheppard Mullin's representation of South Tahoe was ongoing or if it terminated before the Agreement with J-M was signed.[9]

This is a fact question we will not determine in the first instance. We therefore remand for further proceedings in the trial court to determine this question, and for the court to determine the amount of fees that Sheppard Mullin must reimburse to J-M.

## DISPOSITION

The judgment is reversed and the matter is remanded for further proceedings consistent with this opinion. J-M is awarded its costs on appeal.

## CERTIFIED FOR PUBLICATION

COLLINS, J.

We concur:

WILLHITE, Acting P. J.

ZELON, J.[*]

---

[9] Even if South Tahoe was a former client at the time the Agreement was signed, Sheppard Mullin's failure to disclose the relationship to J-M may have violated Rule 3-310(B)(1). As the parties have not briefed this issue, we will not address it here.

[*] Associate Justice of the Court of Appeal, Second District, Division Seven, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.